**Lidan DING, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 03–71013.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 2, 2004.

Filed Nov. 8, 2004.

William Kiang, Law Offices of Kiang & Kiang, San Gabriel, CA, for the petitioner.

Peter D. Keisler, Assistant Attorney General, Civil Division; Terri J. Scadron, Assistant Director; Hillel R. Smith, Attorney, Office of Immigration Litigation, Civil Division, Washington, DC, for the respondent.

Before: REINHARDT, WARDLAW, and PAEZ, Circuit Judges.

WARDLAW, Circuit Judge.

Lidan Ding appeals from the Board of Immigration Appeals' ("BIA") denial of her application for asylum and withholding of deportation, affirming without opinion the adverse credibility finding of the Immigration Judge ("IJ"). The IJ denied asylum finding Ding's forced abortion at the hands of Chinese population control officials was, in fact, voluntary because she "was not subject to physical restraint" during the procedure. Because 8 U.S.C. § 1101(a)(42)(B), which makes persons "forced to abort a pregnancy" statutorily eligible for asylum, does not require a showing that the "force" be physical in nature, much less a showing of physical restraint "during the procedure," the IJ erred as a matter of law in finding Ding's testimony that she was not physically restrained during the abortion fatal to her claim. And because the other bases for the IJ's adverse credibility finding are either unsupported or contradicted by the record evidence, the IJ's adverse credibility decision is not supported by substantial evidence. Taking Ding's testimony as true, she has established statutory eligibility for asylum under 8 U.S.C. § 1101(a)(42)(B).[1] We therefore grant Ding's petition.

**I.**

In 1993, twenty-six-year old Lidan Ding was working in a government-owned construction company in Shanghai when she fell in love with a co-worker, Li Hong. Although Ding and Hong wished to marry, Hong's father, the highest ranking official in the local Communist party district, vehemently disapproved of Ding because she was Christian. Because of her family's Christian religious beliefs, they had been categorized as counter-revolutionaries. Hong's father's powerful position and control over Ding's work unit thus prevented Ding and Hong from obtaining their required marriage recommendation letter.

Ding and Hong devised a plan to force Hong's father's hand: she would become pregnant, and the shame of an out-of-wedlock birth would induce Hong's father to consent to the marriage. It was a plot not

---

1. At oral argument, petitioner's counsel expressly waived petitioner's withholding claim.

without substantial risks. Ding's unauthorized pregnancy would be a gross violation of the work unit's family planning policy; unmarried women were not allowed to become pregnant under any circumstances, and married women needed to have a birth permit issued by the work unit to lawfully conceive. Customarily, a woman who violated the family planning policy would be forced to have an abortion, she would lose her government housing and her job, and a letter would be placed in her permanent employment file. Ding and Hong knew of the possible penalties for violating the policy before deciding to conceive. However, they thought that once Hong's father had agreed to let them marry, his powerful position would protect them from any sanction.

Part of their plan worked; Ding did become pregnant in January of 1994. The night she and Hong discovered she was pregnant, they went to Hong's father, knelt in front of him, and asked permission to marry. However, Hong's father became enraged and kicked his son and Ding out of his home. He also informed Ding's work unit that she had become pregnant.

When Ding reported to work after telling Hong's father of her predicament, she and Hong went to their work unit's leader to ask again for permission to marry. He refused her and informed her that Hong's father had told him to look for the couple because Ding was pregnant. Ding confirmed her pregnancy.

The work unit leader told Ding that she must have an abortion. But even though she had been denied permission to marry Hong, Ding still wanted to carry her pregnancy to term. She wanted to have the child "because this [was][sic] a result of Li Hong and myself, our love. That's all I had." Her refusal to comply with the abortion order angered both the work unit leadership and Hong's father, who stormed into her work unit, severely reprimanded the leadership, and demanded that Ding be forced to abort immediately.

Because she refused to comply with the abortion order, Ding was suspended from her job and ordered to attend a month of birth control re-education classes where she was forced to write self-criticism. She refused, asking instead for permission to keep only this one child even though she was unmarried.

On February 15, 1994, the work unit leadership apparently decided it had enough of Ding's refusal to comply with the abortion order. The director of the birth control classes and her two assistants forced Ding into a van and took her to Shenzhen City Liuhua Hospital, the work unit's contract hospital. Upon arrival at the hospital, Ding attempted to resist the efforts of a nurse to take her into a hospital room. She got onto the floor and, trying to attach herself to it, refused to get up. Two population control officials overpowered her: they pulled her off the floor, forced her on to a hospital bed, and stood over her as the doctor performed the abortion without anesthesia. Ding cried out and attempted to move, but the doctor warned her against movement because the procedure involved suction and scraping of the uterus.

Hong's father used his political influence to transfer his son out of Ding's work unit and into another part of the country. Hong later married another woman, a general's daughter.

Although her relationship with Hong had failed, Ding still very much wanted to have children. In 1995, she met John Margulies, an American businessman who was then living in China. The two fell in love and continued their relationship even after Margulies returned to the United States. Ding knew that Margulies had some health problems, but never saw him ill and was unaware of the nature and extent of his illness.

As the relationship progressed, Margulies asked Ding to marry him and move to the United States. Margulies told her he wanted to have children with her. She happily accepted his proposal, and entered the United States on August 12, 1999, on a three-month K–1 visa intending to marry Margulies.

When Ding arrived in Los Angeles, she was met by Margulies' housekeeper. When they returned to Margulies' home, she discovered her fiancé was bedridden with multiple sclerosis, a condition that he had concealed from her. Ding spent two weeks with Margulies and visited his doctor with him. The doctor told her that Margulies would never be able to have children with her. Angered by this deception, Ding refused to marry Margulies and declined his sexual advances. He then evicted her from his home.

Margulies' housekeeper had met a Chinese woman at the airport while waiting for Ding. This woman took Ding into her home and introduced Ding to her church. Ding began participating in church activities. She was baptized on August 28, 1999. A member of Ding's church suggested that she might be eligible for asylum based upon her forced abortion and urged her to seek legal advice in order to stay in the country. Ding had never known such relief was possible.

On October 25, 1999, Ding filed for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), claiming fear of persecution based on China's coercive family planning policies.[2] In her asylum application, she provided specific details of her forced abortion.

At her asylum hearing, Ding offered testimony consistent with her application, as well as testimony regarding persecution she faced as a Christian. In support of her application, Ding offered the 1999 State Department Report for China detailing the country's coercive population control policies; an affidavit from an American doctor stating Ding had uterine scarring consistent with an early-term abortion; and articles from Chinese newspapers detailing family planning policies.[3]

The IJ excluded several documents, including an abortion verification letter from Shenzen Hospital, which had been obtained for Ding at the request of counsel by a Chinese friend, and two Chinese notarial certificates indicating Ding's marital status and lack of criminal history. The IJ found that the documents had not been properly authenticated, although they had been notarized and Ding included all her correspondence with the Chinese authorities detailing her attempts to authenticate the documents.[4]

---

2. Before the BIA, Ding also asserted as a basis for her asylum claim a well-founded fear of future persecution on account of her Christian religious beliefs. Ding's counsel advised the panel during oral argument that Ding had waived this claim.

3. Ding also presented the testimony of Hallaneice Roberts, Marguilies' former nurse, who corroborated Marguilies' health conditions and stated he was an "evil man" who changed the locks on Ding. Roberts had no knowledge of Ding's life in China.

4. As we find Ding is statutorily eligible for asylum, we need not reach the issue of whether the exclusion of these documents violated her due process rights. Nevertheless, we are troubled by the IJ's exclusion of documents that were clearly relevant to Ding's claim. Ding made every effort to comply with the American Consulate's demands and to have her abortion certificate authenticated by Chinese authorities. The exclusion of documents because the Chinese authorities refused to authenticate them runs contrary to our longstanding principle excusing such authentication because "[p]ersecutors are hardly likely

The IJ questioned Ding aggressively, particularly on the details of her forced abortion. At one point, he asked her if she was restrained by straps during the abortion. When she replied that she was not, the IJ asked Ding how she was restrained if nothing or no one was holding on to her. Ding explained that two people from the birth control unit surrounded her and the doctor warned her against moving. During her testimony, Ding began weeping openly and the proceedings were halted so that she could recompose herself.

On August 23, 2001, the IJ denied Ding's petition based on an adverse credibility finding. Although he credited Ding's testimony that she had undergone an abortion, he concluded that she had done so voluntarily, in large part because of her testimony (which he also chose to credit) that she had not been physically restrained during the procedure. To a lesser extent, the IJ also found the timing of Ding's baptism in the United States "suspicious," although he articulated no specific reasons for the finding. He also faulted her for failing to seek asylum in Hong Kong or Thailand when she had visited those countries on business. Finally, he found her not credible because she did not establish she had suffered persecution on account of her Christian beliefs.

On February 27, 2003, the BIA affirmed the IJ's decision without opinion. Ding timely petitioned for review.

## II.

█ We have jurisdiction over a final order of removal pursuant to 8 U.S.C. § 1252(a)(1). Where, as here, the BIA affirms the IJ's decision without opinion, we review the IJ's decision as the final adjudication on the merits. *See Falcon Carriche v. Ashcroft,* 350 F.3d 845, 851 (9th Cir.2003); 8 C.F.R. § 1003.1(a)(7).

█ Credibility determinations are reviewed "under a substantial evidence standard." *Aguilera–Cota v. INS,* 914 F.2d 1375, 1381 (9th Cir.1990). "Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *Berroteran–Melendez v. INS,* 955 F.2d 1251, 1256 (9th Cir. 1991). Substantial deference is accorded to the IJ's express credibility findings, but only when the IJ has "a legitimate articulable basis to question the petitioner's credibility, and [offers] a specific, cogent reason for any stated disbelief." *Hartooni v. INS,* 21 F.3d 336, 342 (9th Cir.1994).

█ A refugee is an alien who is unable to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion." 8 U.S.C. § 1101(a)(42)(A). Persecution is "the infliction of suffering or harm upon those who differ ... in a way regarded as offensive." *Fisher v. INS,* 79 F.3d 955, 961 (9th Cir.1996) (en banc). An applicant is eligible for asylum "if he can demonstrate a well-founded fear of persecution," which "has both an objective and subjective component." *Aguilera–Cota,* 914 F.2d at 1378. To establish the objective component, an alien must show " 'by credible, direct and specific evidence in the record, ... facts that would support a reasonable fear that the petitioner faces persecution.' " *Id.* (quoting *Rodriguez–Rivera v. INS,* 848 F.2d 998, 1002 (9th Cir.1988)). The subjective component is fulfilled by the applicant's "genuine concern that he will be persecuted." *Id.*

█ Ding is statutorily eligible for asylum if she is able to demonstrate that she

---

to provide their victims with [documentation] attesting to their acts of persecution." *Bola-*

*nos–Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir.1984).

has been persecuted on account of China's coercive family planning policies:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42)(B); *see also Wang v. Ashcroft,* 341 F.3d 1015 (9th Cir.2003).

### III.

■■■■ To determine whether substantial evidence supports the IJ's credibility finding, we evaluate each ground cited by the IJ for his finding. *Wang,* 341 F.3d at 1021. "While the substantial evidence standard demands deference to the IJ, we do not accept blindly an IJ's conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion and determine whether the reasoning employed by the IJ is fatally flawed." *Gui v. INS,* 280 F.3d 1217, 1225 (9th Cir.2002) (quotations omitted).

The IJ's finding that "it appears to the Court that the respondent's abortion was not forced" is premised upon several erroneous assumptions. First, he concludes that Ding acted in a manner "consistent with someone who did not want a child." In support of this conclusion, he offers four specific findings: (1) Ding "voluntarily informed her employer of her pregnancy, aware that her employer would notify the Birth Control Unit"; (2) she "consented" to attend birth control re-education classes; (3) she offered no further protest after telling the supervisor of the Birth Control unit she did not want to have an abortion; and (4) the abortion was performed without physical restraint. Why Ding would go through all this trouble if she did not want the child, and instead simply volunteer for the abortion, is not explained by the IJ or anything else in the record.

In any event, the IJ's first three findings are directly contrary to the record. While Ding did admit to her supervisor that she was pregnant, she testified that she did so only *after* learning that the supervisor had already been informed of the pregnancy by Hong's irate father. Contrary to the IJ's speculation as to motive, Ding did not bring this information to her supervisor knowing it would be reported to the birth control unit, but rather to obtain a marriage recommendation letter. As to her "voluntary attendance" at birth control re-education classes, Ding was suspended from work and ordered to attend those classes. And even though she was forced to attend the classes, she steadfastly refused to recant her desire to carry the pregnancy to term and, in fact, did not voluntarily abort during this time.

Finally, the IJ's finding that Ding went to the hospital without further protest is contradicted by her consistent, uncontroverted testimony. Ding did not meekly accompany the birth control unit supervisor who ordered her to report to the hospital for an abortion. Rather, the supervisor and two other officials from the unit surrounded Ding and forced her into a van. Ding continued to resist once she arrived at the hospital, first by struggling with a nurse, then by crouching on the floor and refusing to get into the hospital bed. The doctor was able to perform the abortion only after two officials from the birth control unit grabbed Ding off the floor, picked her up, placed her on the operating table,

and stood over her while the abortion was performed. Ding continued to cry and struggle during the procedure, but was told by the doctor to stop because the procedure entailed suction and scraping of the uterus.

Because the first three bases for the adverse credibility finding are contradicted by the record, we must determine whether the lack of physical restraints during the procedure is a legitimate basis for the adverse credibility finding. We hold that it is not.

As a factual matter, no evidence is in the record as to whether forced abortions in China routinely entail actual physical restraints during the procedure. The IJ made the impermissible leap from Ding's testimony that the abortion was "extremely painful" due to the lack of anesthesia, to the conclusion that she had to have desired it or else she simply would have gotten up from the operating table and left the hospital. From this unsupported theory, the IJ further concluded that Ding's abortion was not forced. Ding's testimony, however, was that she was forcibly lifted to the surgical table by the birth control unit supervisors who remained throughout the procedure, intimidating Ding and ensuring that it would take place. Their threatening presence was a clear signal that if Ding attempted to get off the table, she would be forced back down. Ding also struggled at the beginning, but was forbidden to move by the doctor because of the nature of the procedure, obviously to prevent further damage to her uterus. Indeed, it is difficult to imagine a woman getting up off an operating table presumably half-undressed while a doctor has her legs spread apart and is cutting, scraping, and suctioning out her uterus.

Ding cried throughout the procedure, and broke down before the IJ while recounting the pain of it. In short, there is nothing in the record that suggests Ding was free to leave even though the Chinese officials had not tied her down. And if Ding was fabricating the story of her forced abortion, it is more likely that she would have testified to the use of physical restraints to embellish her story, rather than testify truthfully to the lack of them.

■ "It is error to rest a decision denying asylum on speculation and conjecture." *Shah v. INS,* 220 F.3d 1062, 1069 (9th Cir.2000). As we have previously noted, "'conjecture is not a substitute for substantial evidence.'" *Vera–Villegas v. INS,* 330 F.3d 1222, 1231 (9th Cir.2003) (quoting *Lopez–Reyes v. INS,* 79 F.3d 908, 912 (9th Cir.1996)). Rather, the substantial evidence that underlies a decision to deny asylum must be in the record. *See Shah,* 220 F.3d at 1067. Here the record is devoid of any such evidence. Therefore, the IJ's conclusion that Ding's abortion was voluntary based on nothing more than speculation about what occurs during a forced abortion may not form the basis of an adverse credibility finding.

■ Nor is there any legal authority to support the "physical restraint" requirement imposed by the IJ. While 8 U.S.C. § 1101(a)(42)(B) does not define the word "force," it does not expressly limit the term to physical force. The ordinary meaning of "force," as in "forced abortion," includes to "[c]ompel or oblige (a person, oneself, etc.) *to do, into doing* or *to* or *into* a course of action; rape (especially a woman)," and to "[c]ompel, or constrain by physical, mental, moral, or circumstantial means." THE NEW SHORTER OXFORD ENGLISH DICTIONARY 998 (1993); *see also* WEBSTER'S NEW INTERNATIONAL DICTIONARY 887 (3d ed.1981) (defining "force" as "to constrain or compel by physical, moral, or intellectual means or by exigencies of circumstances"). The common meaning of "force" thus does not prescribe a certain type of force and certainly does not dictate

physical restraints, as the IJ narrowly interpreted the term.

Reading into the statute a "physical restraint" requirement would also contravene the statute's purpose to bestow refugee status on those individuals in China forced to undergo involuntary abortion or sterilization. As detailed by the 1999 State Department Report, the Chinese government's widespread use of "comprehensive and often intrusive family planning policies," includes "education, propaganda, and economic incentives, as well as . . . more coercive measures, including psychological pressure and economic penalties" imposed by local regulations. *U.S. Dep't of State, China Country Report on Human Rights Practices* 22, 21 (Feb. 25, 2000). Such strategies are used "because intense pressure to meet family planning targets set by the Government has resulted in documented instances in which family planning officials have used coercion, including forced abortion and sterilization, to meet government goals." *Id.* at 21. Physical means are but one method of coercion used to force an individual to undergo an involuntary abortion or sterilization. To limit relief only to those who can prove physical force compelled an unwanted procedure would frustrate Congress's intent to permit any individual "who has been forced to abort a pregnancy or to undergo involuntary sterilization . . . [to] be deemed to have been persecuted on account of political opinion." 8 U.S.C. § 1101(a)(42)(B).

Nor does our precedent so limit the definition of "forced." In *Wang,* petitioner established she had suffered two forced abortions when the Chinese government threatened her with wage reduction and job loss if she did not terminate her pregnancies. *Wang,* 341 F.3d at 1020. Although we did not rule on the precise definition of "force," the "coercion" imposed through a reduction of wages and threats by her employer that she would be fired if she did not obtain an abortion was sufficient to find the abortion was forced. Wang did not assert any sort of physical force *during* her procedure, much less the use of any physical restraint. Nevertheless, she was found eligible for asylum and withholding of deportation based upon a finding that she had "established past persecution through two *forced* abortions and an IUD insertion." *Id.* (emphasis added). Thus, *Wang* makes clear that an applicant does not need to provide evidence of physical restraint to establish the forced nature of an abortion.

Therefore, we hold that an asylum applicant seeking to prove he was subjected to a coercive family planning policy need not demonstrate that he was physically restrained during a "forced" procedure. Rather, "forced" is a much broader concept, which includes compelling, obliging, or constraining by mental, moral, or circumstantial means, in addition to physical restraint.

 Ding was reported to her supervisor, suspended from work for a month during which she was required to attend birth control re-education classes, accosted suddenly by the director of the classes who, along with two birth control unit officials, forced her into a van, to a hospital, into a room, and onto a surgical table for the abortion, all while Ding physically resisted and struggled until warned, during the procedure itself, that she could harm herself. These circumstances demonstrate that the abortion was forced and not voluntary under our precedent. Thus, substantial evidence does not support the IJ's conclusion.

The IJ also viewed Ding's failure to seek asylum in Hong Kong or Thailand when she visited those countries on a business trip in June 1996 as undermining her credibility. He noted that Ding was "unable or unwilling to explain why she did not seek

refuge in another country nor why she voluntarily returned to the country where she claimed to have been persecuted." This conclusion disregards Ding's sworn testimony that her travel documents were held by the leaders of her trip, under whose control she remained at all times. Moreover, no record evidence establishes that either country offered asylum to women fleeing persecution on account of oppressive population control policies. Ding was not even aware that the United States could offer her asylum until a church member suggested she might be eligible.

In any event, had Ding gone to the American embassy in Thailand or Hong Kong seeking asylum, Ding could not have qualified for any relief because forced abortion did not constitute persecution on account of political opinion until October of 1996. *See Li v. Ashcroft*, 356 F.3d 1153, 1157 (9th Cir.2004) (en banc) (detailing how "[c]oncern for the victims of these harsh population practices prompted Congress to amend the definition of 'refugee' to include 'a person who has been forced to abort a pregnancy'"). Although the IJ appears to have assumed that an individual who truly fears persecution in his homeland will automatically seek asylum in the first country in which he arrives, there is no basis for this assumption. *See Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir.1986).

■■■ Ordinarily, when we reverse an adverse credibility determination we remand to the BIA under *INS v. Ventura*, 537 U.S. 12, 17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002), so that the BIA may determine whether an applicant has met the necessary conditions for asylum eligibility. *See Chen v. Ashcroft*, 362 F.3d 611, 621–23 (9th Cir.2004). However, we have held that if an applicant is believed to have suffered forced abortion or sterilization, the applicant is "*necessarily* eligible for asylum under the BIA's interpretation of the INA"

because such a person "is automatically classified as a refugee" under 8 U.S.C. § 1101(a)(42)(B). *He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir.2003) (holding remand unnecessary because petitioner's claim that his wife was subject to forcible sterilization was believed); *see also Ge v. Ashcroft*, 367 F.3d 1121, 1127 (9th Cir.2004) (holding that petitioner was eligible for asylum automatically because he showed that his wife was forced to undergo an abortion under China's one-child policy); *Li*, 356 F.3d at 1160 (holding that petitioner was eligible for asylum automatically under the "other resistance to a coercive populating control program" portion of the statute). "[R]emand for a determination of asylum eligibility is not necessary when the petitioner is 'automatically eligible for asylum' if his testimony is believed." *Zheng v. Ashcroft*, 382 F.3d 993, 1001 (9th Cir.2004) (quoting *He*, 328 F.3d at 604). Thus, a remand under *Ventura* is unnecessary. *He*, 328 F.3d at 604. We therefore remand to the BIA, which shall, on behalf of the Attorney General, exercise discretion regarding whether to grant asylum. *See Ge*, 367 F.3d at 1127.

**PETITION GRANTED.**