

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-3-2005

# Dolab v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4031

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Dolab v. Atty Gen USA" (2005). *2005 Decisions.* Paper 457.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/457

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 04-4031
_____

ZHANNA DOLAB,
                    Petitioner,

vs.

ATTORNEY GENERAL OF THE UNITED STATES,
                    Respondent.

_____

On Petition for Review of an Order of Removal
from the Board of Immigration Appeals
U.S. Department of Justice
Executive Office for Immigration Review
(BIA No. A78-308-433)

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 27, 2005

_____

Before: RENDELL, FUENTES, and GARTH, Circuit Judges

(Opinion Filed:  October 3, 2005)

_____

OPINION

_____

Garth, Circuit Judge:

Zhanna Dolab ("Ms. Dolab"), a native and citizen of Belarus, petitions this Court

to review an order of the Board of Immigration Appeals ("BIA") summarily affirming the

denial of her application for asylum, withholding of removal, and protection under the

Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied Ms. Dolab's

application solely because he determined that she was not credible. The IJ made several

factual findings on which he based this determination. Some of these findings have no

basis in the record, while others do find support in the record. Though this is a close case,

we find that there is substantial evidentiary support for the IJ's denial of Ms. Dolab's

application. We will deny the Petition for Review.

## BACKGROUND

I.

On September 16, 2001 Ms. Dolab entered the United States unlawfully from

Mexico by crossing the Rio Grande River into Texas. The Immigration and

Naturalization Service ("INS")[1] found Ms. Dolab removable pursuant to 8 U.S.C.

§1182(a)(6)(A)(i) because she was an alien present in the United States without being

admitted or paroled, and who arrived in the United States at a time and place other than

---

[1] As of March 2003, "the INS ceased to exist as an independent agency within the United States Department of Justice ['DOJ'] and its functions were transferred to the newly formed United States Department of Homeland Security." *Leia v. Ashcroft*, 393 F.3d 427, 430 n.4 (3d Cir. 2005). The BIA remains within the DOJ. *Knapik v. Ashcroft*, 384 F.3d 84, 86 n.2 (3d Cir. 2004) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 451, 471, 116 Stat. 2135 (2002)).

that designated by the Attorney General. Venue was transferred from El Paso to Philadelphia.

At an initial hearing on December 13, 2001, Ms. Dolab conceded removability, but stated her intention to apply for asylum, withholding of removal and protection under the CAT, claiming she had been persecuted in Belarus on the basis of her political opinion. Soon thereafter, she submitted her application. On May 9, 2002, the IJ continued the hearing on the merits of that application for slightly more than a year. Ms. Dolab indicated that she would be submitting evidence to support her application over the course of that year. (108).[2]

## II.

At a merits hearing on May 19, 2003 and in the affidavit she submitted with her application, Ms. Dolab testified to the following:

She was a member of the pro-democracy United Civil Party ("UCP"), which opposes the authoritarian regime of Belarus's President Alexander Lukashenko. Ms. Dolab was inspired to join the party in 2000 when she returned to Belarus after spending two years in the United States. She stated in her affidavit:

> Having visited the US for the first time my life views have changed[.] I realized I changed and started to look at things differently. Even before this trip I realized that regime of our President Lukashenko was unfair and that there was no democracy in our country, and that people suffer indignity

---

[2] The government represents that the "IJ continued the hearing on the merits for over one year to enable the Petitioner to file additional supporting evidence."

> throughout their lives. After a visit to the United States my country of Belarus and life under regime of Lukashenko just seemed to me a horrifying place to live. I realized this was all the fault of our government and its policy . . . I could not put up with such a government and decided I had to struggle for democracy together with the party of "UCP."

(268).

Ms. Dolab's primary role in the party was to create and distribute party leaflets and flyers. On several occasions she suffered abuse at the hands of state agents due to her membership in and activities on behalf of the UCP.

On October 8, 2000, she attended a rally opposing certain government officials in her city, Grodno. Police arrested and beat many people during the rally, but Ms. Dolab was not among them. Soon thereafter, however, her mother was approached by unidentified people who asked questions about Ms. Dolab. Ms. Dolab drew from this the conclusion that she was under government surveillance.

In the middle of February, 2001, on her way home from an evening spent passing out UCP leaflets on a suburban train, Ms. Dolab was approached by police who asked her to follow them to police headquarters. At headquarters, the police refused to allow Ms. Dolab to call home to let her family know she was alright. They asked her whether she was a member of the UCP and what she did for the party. They also asked her for information about her friends within the party. Ms. Dolab told the police about her own involvement in the UCP, but refused to "inform on [her] friends." (122). In response, the

-4-

police told her she was naive, yelled at her, and threatened her. They then forcibly poured vodka down her throat, gave her a blood-alcohol test to determine that she was intoxicated, and then fined her for drunk and disorderly conduct in a public place. Ms. Dolab paid the fine, and was allowed to leave after about 8 hours, but the police told her to cease her activities with the UCP, or else that would not be the last meeting between her and them.

The police later told Ms. Dolab's employer that she had been fined for public drunkenness. She explained to her employer what had actually happened – that the arrest had been politically motivated. As a private enterprise employer already disfavored by the anti-privatization government, however, he was reluctant to attract attention, and thus fired Ms. Dolab anyway.

After this incident, Ms. Dolab took a brief trip to Poland, which she testified was 17 kilometers from her home, to buy food and medicine. (157-58).

On March 25, 2001, Ms. Dolab attended a demonstration in a central square in Minsk. Military soldiers descended on the square and beat and arrested several participants, including Ms. Dolab. The soldiers took Ms. Dolab into custody and then turned her over to police officers from Grodno. The police isolated Ms. Dolab for 24 hours and then ordered her to plead guilty to their accusations. Ms. Dolab did not know what those accusations were and accordingly refused to plead guilty. The police then interrogated her and called her "bad names." They kicked her and beat her with batons in

her stomach until her uterus began to bleed. This was especially painful for Ms. Dolab because she suffers from fibroma. Realizing how badly she was hurt, the police delivered her to the hospital, where she stayed for three days.

After she was released from the hospital, she went to Moscow to stay with her aunt and recover. Following a period of recuperation, however, Ms. Dolab needed to earn some money. At the end of April she thus found a job as a "bus stewardess" in Belarus, and returned to live and work there.

On April 30, 2001, in her capacity as a bus stewardess, Ms. Dolab escorted a busload of tourists to the Czech Republic. She returned to Belarus on May 17, 2001.

On July 3, 2001, Ms. Dolab attended a celebration in Grodno commemorating Belarus's liberation from fascism during the Second World War. As she was returning home late that night, she heard footsteps behind her. Frightened, she ran into the lobby of her building and pushed the button for the elevator. The elevator did not come in time; Ms. Dolab's pursuers caught up with her and hit her over the head with a bottle. Before Ms. Dolab lost consciousness, she recognized the men who had hit her as the police who had interrogated and beaten her on March 25, 2001. When she regained consciousness, she realized she had been raped.

After this incident, Ms. Dolab "could not get back to [her]self for a long time." (134). She began to receive phone calls in which the caller threatened that if she complained to anyone about what had happened, the police would put her in prison or

make her "disappear" as other pro-democracy activists in Belarus had.  Terrified, Ms. Dolab fled with her friend Timofey Ivanov ("Ivanov")[3] to Mexico on September 5, 2001. Before she left, however, Ms. Dolab took several brief trips to Poland and a trip to Moscow.  Some of these trips apparently had some connection with Ms. Dolab's attempts to secure a ticket to Mexico.  (161-63).

III.

In support of her application Ms. Dolab submitted country conditions reports from the U.S. State Department and several non-governmental organizations, as well as several newspaper articles about political protests and police misconduct in Belarus.  These materials confirmed generally that the Lukashenko regime committed abuses against those who opposed it.  For example, the introduction to the State Department Report alone contains this corroborating information:

> the Presidential Guard – which was created initially to protect senior officials – continued to act against the political enemies of the Lukashenko regime with no judicial or legislative oversight.  Members of the security forces committed numerous serious human rights abuses . . . At least one suspicious death of a political activist was reported.  The authorities did not undertake serious efforts to account for the disappearances of well-known opposition political figures in previous years and discounted credible reports during this year regarding the regime's role in those disappearances . . . Security forces arbitrarily arrested and detained citizens, and the number of apparently politically motivated detentions greatly increased, although many of those detained were held for brief periods.  The security services continued to infringe

---

[3] Ivanov is currently in California.  (142).

> on privacy rights and freedom of movement by closely monitoring the activities of opposition politicians, human rights organizations, and other segments of the population . . . Opposition political parties and movements were subjected to increased pressure through both judicial and extra-judicial measures, including physical abuse of political opponents.

(169).

Aside from the country conditions reports and newspaper articles, Ms. Dolab did not submit any other documentary evidence with her application. When asked why she did not submit letters from her family members corroborating her story, she said: "I don't correspond with them. I just simply telephone them." (163). When asked why Ivanov did not attend her hearing to give testimony in support of her application, she stated: "I don't understand the question. I have no idea why he's not here today. This is my court hearing, not his." (142).

Ms. Dolab left papers – including original papers documenting the medical treatment she received after she was beaten and raped – with her sister in Belarus. Ms. Dolab's sister gave the original papers to her mother, who passed away on April 22, 2002. No one was able to find the papers in Ms. Dolab's mother's home after she passed away. Ms. Dolab also took copies of these papers with her to the United States. They were destroyed, however, during her passage through the Rio Grande River to the United States.

IV.

After the hearing, the IJ found Ms. Dolab not credible and denied her application.

The adverse credibility determination rested on several bases. The IJ found it implausible that (1) police would have singled Ms. Dolab out for mistreatment when she had been involved with the UCP for only a short time and had performed for the party only a "menial job," and that (2) Ms. Dolab would have returned to Belarus after leaving the country on several occasions when she had been treated so brutally in Belarus. Further, the IJ was disturbed by what he identified as inconsistencies between Ms. Dolab's testimony at the hearing and information she supplied in her application and accompanying affidavit. Finally, the IJ was disturbed that Ms. Dolab lacked documentation of her assertion that she was under government surveillance after the October 8, 2000 rally, her membership in the UCP, and the medical treatment she received after being beaten and raped. The IJ did not rely for his adverse credibility determination on his personal observations of Ms. Dolab's demeanor.

The IJ gave no indication in his opinion that he had reviewed the country conditions reports that Ms. Dolab submitted, or compared the specific incidents she described to the general information in those reports.

The BIA summarily affirmed the IJ's decision.

## JURISDICTION & STANDARD OF REVIEW

The BIA's jurisdiction arose under 8 C.F.R. §1003.1(b). We have jurisdiction to review the BIA's decision under 8 U.S.C. §1252. Where, as here, "the BIA issues a summary affirmance under its streamlining regulations, we essentially review the IJ's decision as if it were the decision of the BIA." *Jishiashvili v. Attorney General*, 402 F.3d

-9-

386, 391 (3d Cir. 2005).

"[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. §1252(b)(4)(B). In other words, the IJ's decision must be supported by substantial evidence. *Dia v. Ashcroft*, 353 F.3d 228, 247 (3d Cir. 2003).

"An alien has the burden of supporting [her] claim for relief from removal. An alien's credibility, by itself, may satisfy [her] burden, or doom [her] claim." *Id.* (citing *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002)). "We look at an adverse credibility determination to ensure that it was appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony." *Id.* at 249. Minor inconsistencies do not provide an adequate basis for an adverse credibility finding. *Xin Jie Xie v. Ashcroft*, 359 F.3d 239, 243 (3d Cir. 2004) (citations and quotations omitted).

"Where an IJ bases an adverse credibility determination on 'implausibility,'" as the IJ in part did here, "such a conclusion will be properly grounded in the record only if it is made against the background of the general country conditions . . . [A]dverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible." *Dia*, 353 F.3d at 249 (citations and quotations omitted).

## DISCUSSION

The IJ denied Ms. Dolab relief only because he found her not credible. The sole issue before us is whether that adverse credibility determination was supported by substantial record evidence. We thus evaluate each basis cited by the IJ for that

-10-

determination.

1. **Implausibilities**

The IJ found Ms. Dolab not credible in part because he found two aspects of her testimony implausible. As explained below, there is no basis in the record for the first finding of implausibility, but substantial evidence supports the second such finding.

First, the IJ found it difficult to believe that the Belarussian government would have singled Ms. Dolab out for mistreatment. He stated:

> It is difficult for the Court to understand or to believe that the police would have a vested and such an interest [sic] in the respondent as she would have me to believe. The respondent was only a member of the [UCP] party for a rather short period of time and had the menial job of printing fliers and handing out fliers along with other individuals. It is inconceivable for this Court to believe that the police were so interested in her that they would arrest her and then interrogate her as to the names of other party members. The Court does not understand why the police would even think that she would know other party members insofar as her duties in the party would provide her with such information. That line of testimony was totally incredible to the Court.

(87). The State Department Report on Belarus, however, contains statements that directly bear upon and inferentially support Ms. Dolab's testimony that the Government singled her out for interrogation despite the fact that her job disseminating flyers was, in the IJ's view, "menial." For example, that Report states that

> [u]nidentified plainclothes officials working for the security services . . . regularly apprehended and detained individuals engaged in antiregime demonstrations *and in the distribution of opposition materials. There were several reports that*

-11-

*individuals and members of organizations involved in
publishing opposition media were arrested and detained.*

(171) (emphasis added).

The IJ's "implausibility" finding was not "made against the background of the

general country conditions," as was required. *Dia*, 353 F.3d at 249. It thus is not

supported by substantial evidence. *See id.* at 259 (rejecting IJ's finding that it was

implausible that low-ranking persons in a Guinean opposition party would be arrested and

detained when the record contained evidence that such arrests and detentions *were*

occurring in Guinea).[4]

The IJ also found it implausible that Ms. Dolab would have returned to Belarus

after leaving the country on several occasions (to go to Poland, the Czech Republic and

Russia). The IJ stated

> It is difficult for this Court to believe . . . that notwithstanding
> the horrendous episodes that the respondent related to the
> Court she time and time again returned to Belarus when she
> had the opportunity of leaving that country and staying in the
> country traveled to and asking for some type of protection in
> that country. When confronted with this fact the respondent's
> answer was simple, and she stated that Belarus was her home
> and consequently she would return there. That in and of
> itself, again, does not make particular sense. If, indeed, the
> respondent had undergone what she told the Court she had
> experienced in her country, surely in one of her many trips

---

[4] Disturbingly, the IJ did not even indicate that he had reviewed the country conditions
reports, as he was required to do. *See Berishaj v. Ashcroft*, 378 F.3d 314, 320 (3d Cir. 2004)
(noting that an article in the record corroborated petitioner's testimony and that it is not
"permissible for the IJ . . . not to address the relevant country report in some detail").

-12-

> outside of Belarus she would have sought some type of
> protection in that country she was visiting.

(93).

The fact that an asylum applicant leaves the country in which she allegedly fears persecution and then returns to it before fleeing for good is not *per se* enough to undermine her credibility.[5] *See, e.g., Ding v. Ashcroft,* 387 F.3d 1131, 1139-40 (9th Cir. 2004); *Damaize-Job v. I.N.S.,* 787 F.2d 1332, 1337 (9th Cir. 1986). Nevertheless, we are as troubled as the IJ was by the fact that Ms. Dolab took such an unusually large number of international trips during 2001, and each time returned to Belarus. This fact, and the fact that several of these trips occurred after the incident (the July 2001 rape) that she presented in her testimony as the turning point – the event that precipitated her desire to leave Belarus for good – are difficult to reconcile with her claim that she feared for her safety. When the Government asked Ms. Dolab why she returned to Belarus time and time again, she replied (as the IJ noted) only: "It's my home. I resided, I had my family. I cannot live in a foreign country on the street." (163). We cannot conclude that any reasonable adjudicator would be compelled to find Ms. Dolab credible despite the many trips she took to Poland, the Czech Republic and Russia during the period state agents

---

[5] Ms. Dolab explained that she returned from her visit to her aunt in Moscow in particular because she needed to earn some money. We note that needing to work is not an unreasonable impetus for returning home. In fact, we recently reversed an IJ's denial of asylum to a Ghanaian woman who had been persecuted in Ghana despite the fact that she had fled to Nigeria and then returned from there to Ghana in part because she had "no money." *Fiadjoe v. Attorney General*, 411 F.3d 135, 140 (3d Cir. 2005).

allegedly were persecuting her.

## 2. Inconsistencies

The first inconsistency the IJ identified was in Ms. Dolab's accounts of the July 3, 2001 rape. Ms. Dolab wrote an affidavit in Russian which she had translated into English and then submitted with her asylum application. In the translated affidavit Ms. Dolab stated that, on the way home from an evening spent distributing leaflets at her city's celebration of "the day of Liberation of Belarus from Fascists,"

> I heard steps behind my back. I tried to escape but they caught up at the porch of my house and hit me on the head with a bottle. As I was loosing [sic] my consciousness I managed to make out the faces of two men, who were the same individuals that chased me earlier. I know they were the militia officers. I cannot tell how much time I spent lying unconscious on the ground, but when I regained my consciousness I realized I was raped. It is very hard for me to put in words what I felt at that horrific moment.

(271). At her hearing, Ms. Dolab recounted the same story. An interpreter present at the hearing translated her words in this way:

> A: [In] July there was a liberation date in Belarus and the celebration of the city.
>
> Q: What happened on that day?
>
> A: I am coming back home in the evening. It was like, it was the middle of the night because we distributed fl[y]ers. I can hear steps in the back. I got frightened, ran into a lobby. I tried to press the button to get the elevator down, but the elevator was far away. I mean the elevator was up and I knew they will get me . . .

-14-

Q: And the building you walked into was your, was your apartment house or was that another building?

A: That's correct. My residence.

Q: All right. And what happened.

A: Okay. I pushed the button to get the elevator, but I knew it was not enough time because the elevator was up and the door in the lobby were already in the process of being opened. I see two men running toward me. I made decision run upstairs. I reside on the sixth floor at the time. They got me.

Q: What happened next?

A: They knocked me with a bottle on my head . . . I fell to the ground and I am, I am feeling I'm passing out. I could identify those as a police. I saw them before at the time I been interrogated back on March 25th. Eventually I passed out. When I regained my composure I realize I got raped . . . After, after that particular event I could not get back to myself for a long time.

(131-32).

Ms. Dolab's attorney pointed out that the English version of Ms. Dolab's affidavit translated the word Ms. Dolab used to describe the place where the rape took place as "porch," whereas the interpreter at the hearing (a different person than translated Ms. Dolab's affidavit) translated that word as "lobby." To demonstrate that this difference was one of translation only and did not reflect a substantive difference in the two tellings of the story, Ms. Dolab's attorney showed the interpreter present at the hearing the version of Ms. Dolab's affidavit that she had written in Russian, and asked him to translate the relevant portion of it. The interpreter translated that portion in this way:

-15-

> Coming back home I heard behind steps. I was running. But they apprehended me in the *lobby* and they literally gave me a bottle on my head, which is they strike for my head.

(166) (emphasis added). After this clarification, it was clear that the porch/lobby disparity was actually no disparity at all.

During Ms. Dolab's cross-examination, the Government pointed out that her affidavit referred to the building in which she lived (in translation) as a "house" whereas it had been referred to (in translation) at the hearing as a "building." The Government asked

> can you explain why you call it your house in your affidavit, but here in testimony you call it your building, an apartment building. There is a significant difference between those.

(141). Ms. Dolab replied: "Well, you have to understand every building we call a house." *Id*. Indeed, the words "house" and "apartment" are often used interchangeably by city dwellers in this country as well.

Both inconsistencies in Ms. Dolab's two accounts of her rape thus were (1) in the first place, minor, and (2) explained away at her hearing as being products of translation from the Russian. Nevertheless, the IJ cited them as one of the major reasons for his denial of Ms. Dolab's application. He stated that the version of her story she told at the hearing was

> completely different than the version set forth in her affidavit. Whenever the Court sees diametric differences between the testimony of the respondent and the affidavits that she is

-16-

submitting in support of her claim, the credibility of the respondent in a case in chief naturally suffer. [sic].

(90). These differences were explained. The IJ's adverse credibility determination is not supportable on the basis of them.

The other inconsistencies the IJ identified were between information submitted on Ms. Dolab's I-589 application and information she supplied at her hearing. They, too, were explained at Ms. Dolab's hearing, but the IJ persisted in relying on them, pointing to them in his opinion as one basis for his adverse credibility finding.

On her application Ms. Dolab stated that she first came to the United States in October 10, 2000, (285), whereas she testified at the hearing that she first entered this country in autumn of 1998. (143-44). On her application she stated that she had had no employers in the past 5 years, (286), but she testified at her hearing that she had had two employers during that period. The location of her signature on her application reflects that no one besides Ms. Dolab prepared the document, (292), but she testified that someone in her lawyer's office had actually typed it for her. (144, 146-49).

Ms. Dolab stated that the information on her application that conflicted with her testimony was erroneous and that the fault for it lay with her lawyer's office. Her lawyer then represented to the court:

> I do confirm that our office did fill out the application . . . I was training a new secretary at the time and these are her typos, Your Honor. I do apologize . . . This is completely my mistake and no fault of the respondent.

-17-

(151-52).

Despite this admission, the IJ apparently refused to believe that Ms. Dolab had not completed the I-589 application herself, and thus that the inconsistencies between the application and the testimony were not evidence that she was lying. He stated that

> It is extremely difficult for this Court to believe that an attorney's office completing an application for asylum would note on that application that it was not, indeed, completed by them.

(192-93).

The IJ's adverse credibility determination is not supportable on the basis of these inconsistencies.

## 3. Lack of Documentation

Finally, the IJ based his adverse credibility finding on the fact that Ms. Dolab did not present documentation (1) demonstrating that she was under government surveillance after the October 8, 2000 rally, (2) proving that she was a member of the UCP, and (3) showing that she had undergone medical treatment after she was beaten and raped by police. Of course, corroboration is not always required to establish credibility. *Dia*, 353 F.3d at 253. We have held, however, that an applicant – even an otherwise credible applicant – may be required to present evidence to corroborate her story so long as the BIA (1) identifies the facts for which it is reasonable to expect corroboration, (2) inquires into whether the applicant has provided information corroborating the relevant facts, and (if she has not) (3) analyzes whether the applicant has adequately explained his or her

-18-

failure to do so. *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2003). *See also, e.g., Dia*, 353 F.3d at 253-54.

We find that it was unreasonable for the IJ to have expected Ms. Dolab to corroborate her assertion that she was under government surveillance after the October 8, 2000 rally. It is not at all clear how a person would corroborate such an assertion, *see, e.g., Dia*, 353 F.3d at 253 (finding it impossible to imagine how an asylum applicant could have provided documentary support for his assertion that the military was "after him"), other than to submit reports indicating that the Lukashenko regime monitored the activities of opposition groups and their members generally, which Ms. Dolab did.[6]

Under the particular circumstances of this case, however, we do find that it was reasonable for the IJ to expect *some* sort of corroborating evidence for Ms. Dolab's claim that she was a member of the UCP and that she underwent medical treatment. *See Abdulai*, 239 F.3d at 554 (observing without expressing agreement that the BIA's decisions establish that it is reasonable to expect an applicant to corroborate her assertion that she underwent medical treatment).

Though Ms. Dolab had more than a year during which to gather such evidence, she failed to do so. She explained how original copies of certain documentation of her medical treatment and membership in the UCP was lost (after her mother died) and

---

[6] The State Department Report, for example, stated that "[t]he security services continued to infringe on privacy rights and freedom of movement by closely monitoring the activities of opposition politicians, human rights organizations, and other segments of the population . . . The Presidential Guard (or security service) reportedly continued to conduct surveillance activities of the President's political opponents." (169 & 171).

destroyed (in the Rio Grande River).  She presented no explanation, however, for why she was not able to obtain affidavits from Ivanov (who is currently in California) or members of her family (with whom she is in telephone contact) confirming some of the facts to which she testified, though the Government gave her the opportunity to articulate such an explanation during its cross-examination of her.  (142, 163).  *See, e.g., id.* (noting that the BIA has "stated that it is generally reasonable to expect applicants to produce letters from family members remaining in the applicant's home country").  When the IJ explained his denial of her application to Ms. Dolab, he stressed that her failure to either produce documentation or explain why she could not do so was a major reason for his decision.[7] He thereby analyzed whether Ms. Dolab had adequately explained her failure to produce

_____

[7] The IJ told Ms. Dolab

> I don't believe your testimony and you haven't helped yourself by the fact that you have not submitted one bit of evidence to support what you're telling me.  You could have submitted letters, affidavits, anything.  Even from this person you traveled with, [Ivanov].  Nothing.  Now, your affidavit says that you had copies of medical reports and a complaint against the government and had evidence that what you were telling me was true and that while you came into the United States they got wet and they got destroyed. It's highly unlikely, ma'am.  Then in your affidavit you say you left everything back in Belarus with your sister . . . Well, since this case was last heard more than [a] year ago, the natural presumption would be that you would get these documents from your sister. And your rebuttal to that is, well, my sister gave them to my mother and my mother, and now the documents are lost.  That doesn't make sense either.  I'm pretty sure you're lying.  I know you're not credible.  I'm pretty sure you're intentionally lying to me and that you made [up] this entire . . . case.

(167-68).

documentation, within the meaning of *Abdulai*.

## **CONCLUSION**

Though some of the evidence supports a finding that Ms. Dolab was credible, we hold that the IJ's determination is sustainable on the basis of Ms. Dolab's several international trips and her failure to produce witnesses (e.g., Ivanov) and documentation of certain facts. We will DENY the Petition for Review of the BIA's decision.