**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ZI ZHI TANG,

　　　　　　　　　　*Petitioner,*

　　　　　v.

ALBERTO R. GONZALES, Attorney
General,

　　　　　　　　　　*Respondent.*

No. 04-70804

Agency No.
A71-565-867

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
November 16, 2006—Honolulu, Hawaii

Filed June 6, 2007

Before: Stephen S. Trott, Kim McLane Wardlaw, and
William A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher

## COUNSEL

Charles J. Kinnunen, Hagatna, Guam, for the petitioner.

Donald A. Couvillon, John C. Cunningham, Richard M. Evans, Joan E. Smiley, Office of Immigration Litigation, DOJ, Washington, D.C., TAGU-District, Office of the District Director, Hagatna, Guam, for the respondent.

## OPINION

W. FLETCHER, Circuit Judge:

We review the petition of Zi Zhi Tang ("Tang"), a native and citizen of the People's Republic of China. Tang filed an application for asylum and withholding of removal, alleging that the abortion performed on his wife, Li Zhen Tang ("Li Zhen"), constituted persecution by the Chinese government as a forced abortion under 8 U.S.C. § 1101(a)(42)(B). The Immigration Judge ("IJ") denied Tang's application, stating that Tang had not demonstrated that the abortion procedure performed on his wife was "forced" within the meaning of the statute. The Board of Immigration Appeals ("BIA") affirmed. We grant the petition for review.

We hold that Tang established that Li Zhen underwent a forced abortion within the meaning of § 1101(a)(42)(B), *see Ding v. Ashcroft*, 387 F.3d 1131, 1139 (9th Cir. 2004), and is therefore statutorily eligible for asylum. We remand for the Attorney General to exercise discretion on Tang's asylum claim. We further hold that victims of forced abortion, like victims of forced sterilization, are statutorily entitled to withholding of removal. We therefore grant withholding of removal.

### I.   Facts and Procedural History

Tang and his wife, Li Zhen, met while they were both working in China. Tang was a carpenter. Li Zhen did book-

keeping for a company that repaired houses. Neither had reached the age required by China's population control policies to register for marriage. Nonetheless, they chose to live together "as husband and wife."

Tang testified that in 1980, Li Zhen discovered that she was pregnant. In April or May of 1980, Li Zhen's company required her to undergo a gynecological examination. During that exam, the company discovered that Li Zhen was pregnant. Tang testified that because he and Li Zhen were under-age and because they did not have documentation of an official marriage, the employer's policy required Li Zhen to "abort the baby immediately." Li Zhen knew of this company policy at the time of her exam. The company told Li Zhen that the day after the exam she must have an abortion.

The next day Li Zhen did not go to work. Instead, she "prepare[d] herself for the abortion." Tang also did not go to work. In the afternoon, company officials came to their home and "took" Li Zhen to the Fun Tsang Company's women's clinic. Tang "followed" his wife to the clinic and waited "outside the door." Tang reported that Li Zhen "cried and screamed but it didn't help." He testified, "They just abort the baby without anesthesia and I can hear my wife screaming."

After the abortion, Li Zhen got pregnant again, but was unable to carry the baby to term due to complications from the abortion procedure. Later, Li Zhen and Tang had one child who was born after their official marriage ceremony.

In 1991, Tang's company sent him to Guam to work on a construction project. Tang remained in Guam after leading a worker's strike that protested poor working conditions and the lack of wages. He later received a Notice to Appear for over-staying his worker's visa. At his hearing before the IJ in 2002, Tang conceded removability, but requested asylum, withholding of removal under the Immigration and Nationality Act

(INA), and relief under the Convention Against Torture
(CAT).

The IJ found that Tang was credible. Tang's application for
asylum and withholding of removal was denied, however,
because the IJ concluded that Tang had failed to establish that
Li Zhen's abortion was "forced." The IJ gave three reasons
for this conclusion. First, the IJ stated that the abortion was
"something that the wife and the respondent apparently were
agreeable to doing" since Li Zhen and Tang did not "ever
express[ ] any opposition or ma[k]e any efforts to avoid the
wife having to undergo the abortion procedure." Second, the
IJ stated that the abortion was voluntary because Li Zhen did
not go into hiding to avoid the abortion. Third, the IJ stated,
and the government argued before this court, that Li Zhen's
abortion was not forced within the meaning of
§ 1101(a)(42)(B) because the abortion was required by Li
Zhen's employer rather than "pursuant to any official sum-
mons or any type of family planning officials." The BIA
affirmed in a short opinion signed by one board member.

In his petition for review, Tang alleges that the IJ erred in
denying his asylum application and in denying withholding of
removal under the INA. He does not raise his CAT claim
before this court. We have jurisdiction to review the denial of
Tang's asylum application under 8 U.S.C. § 1252(a)(2)(B)(ii).
*See Hosseini v. Gonzales,* 464 F.3d 1018, 1021 (9th Cir.
2006). Tang's eligibility for withholding of removal turns on
the statutory definition of forced abortion, which is a legal
question. We have jurisdiction to review questions of law
under § 1252(a)(2)(D). *See Ramadan v. Gonzales*, 479 F.3d
646, 650 & n.3 (9th Cir. 2007).

## II.   Standard of Review

When, as here, it is unclear whether the BIA conducted a
de novo review, we "look to the IJ's oral decision as a guide
to what lay behind the BIA's conclusion." *Avetova-Elisseva*

*v. INS*, 213 F.3d 1192, 1197 (9th Cir. 2000) (as amended) (reviewing both opinions even though the BIA's "phrasing seems in part to suggest that it did conduct an independent review of the record," because "the lack of analysis that the BIA opinion devoted to the issue at hand — its simple statement of a conclusion — also suggests that the BIA gave significant weight to the IJ's findings"). The BIA's determination that an applicant has not established asylum eligibility is reviewed for substantial evidence. *Gu v. Gonzales*, 454 F.3d 1014, 1018 (9th Cir. 2006). The BIA's finding of ineligibility will be reversed only if the evidence "compels" the reversal. *Id.* at 1021 (emphasis omitted). The BIA's determination of a purely legal question is reviewed de novo. *See Zheng v. Ashcroft*, 332 F.3d 1186, 1193 (9th Cir. 2003).

## III.  Discussion

### A.  Asylum Eligibility for Forced Abortion

**[1]** Victims of coercive population planning policies, including those subjected to forced abortion, are "statutorily eligible for asylum" under 8 U.S.C. § 1101(a)(42)(B). *Ding*, 387 F.3d at 1136-37; *see also Li v. Ashcroft*, 356 F.3d 1153, 1160 (9th Cir. 2004) (en banc) (forced abortion); *He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir. 2003) (forced sterilization); *cf. Mohammed v. Gonzales*, 400 F.3d 785, 799-800 (9th Cir. 2005) (holding that victim of female genital mutilation was entitled to asylum). Section 1101(a)(42)(B) applies to people who have been persecuted under such policies, including "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program[.]" The BIA and this court have held that the spouses of victims of coercive population policies qualify for protection under § 1101(a)(42)(B). *In re C-Y-Z-*, 21 I. & N. Dec. 915, 918 (BIA 1997); *see also He*, 328 F.3d at 603-04. We have held that, at least for couples who do not meet the age require-

ments to marry under population control policies, the failure to have an official marriage ceremony does not preclude male partners of women who have had forced abortions from obtaining asylum under § 1101(a)(42)(B). *Ma v. Ashcroft*, 361 F.3d 553, 561 (9th Cir. 2004); *see also id.* at 559 (observing that Congress intended to grant asylum to Chinese " 'couples' persecuted on account of an 'unauthorized' pregnancy and to keep families together" (quoting H.R. Rep. No. 104-469(I), at 174 (1996))).

Tang's asylum application was denied because the IJ determined that Li Zhen was not "a person who has been forced to abort a pregnancy." *See* 8 U.S.C. § 1101(a)(42)(B). The IJ's conclusion rested on the definition of the operative phrase "has been forced." The IJ read the term "forced" as requiring three elements of proof. None is supported by the text of the statute, its legislative history, or our precedent.

First, the IJ stated that Li Zhen "apparently . . . willfully went to the procedure" because there was "no indication that [Tang and Li Zhen] ever expressed any opposition or made any efforts to avoid the wife having to undergo the abortion procedure." The IJ erred in defining "force" as requiring that the victim demonstrate resistance. Force, as used in the statute and as interpreted in our precedent, is not so narrowly defined.

**[2]** In *Ding*, we granted the petition of an asylum applicant who had an abortion under China's population control policies. 387 F.3d at 1140. We held that, contrary to the requirement imposed by the IJ, an asylum applicant need not demonstrate that she was physically restrained during an abortion procedure to show that the procedure was forced. *Id.* at 1139. Noting that the word "force" is not defined by the statute, we relied on the term's "ordinary meaning" to hold that, under § 1101(a)(42)(B), " 'forced' is a much broader concept, which includes compelling, obliging, or constraining by men-

tal, moral, or circumstantial means, in addition to physical restraint." *Id.* at 1138-39.

**[3]** The events, as described by Tang, are more than enough to establish that Li Zhen was "forced to abort [her] pregnancy." *See* 8 U.S.C. § 1101(a)(42)(B). Several events demonstrate that Li Zhen was "compel[led], oblig[ed and] constrain[ed] by mental, moral, or circumstantial means." *Ding*, 387 F.3d at 1139. Tang testified that he and Li Zhen wanted to have a baby, and the IJ found his testimony credible. Whether Li Zhen could have or did "express[ ] any opposition" to the abortion does not affect the existence of the force that was demonstrated. The gynecological exam that detected her pregnancy was mandatory. It was performed by her employer, upon whom she was economically dependent. The policy of the company for which Li Zhen worked required her to have an abortion because she was not of marriage age and had not had an official marriage ceremony. The day after the examination, representatives from Li Zhen's company came to her home and "took" her to a clinic. Finally, the abortion was performed without anesthesia, a particularly barbaric exertion of authority.

**[4]** Second, the IJ stated that "neither [Tang] nor his wife tried to avoid an abortion by going into hiding." The IJ's imposition of a "hiding" requirement does not comport with our understanding of "force" under § 1101(a)(42)(B). In *Ding*, we explained that reading into the statute additional requirements to demonstrate that the procedure was forced "contravene[s] the statute's purpose." 387 F.3d at 1139. "Forced" is a "broad[ ] concept" under the statute because "the Chinese government's widespread use of 'comprehensive and often intrusive family planning policies[ ]' includes 'education, propaganda, and economic incentives, as well as . . . more coercive measures, including psychological pressure and economic penalties' imposed by local regulations." *Id.* (quoting U.S. Dep't of State, *China Country Report on Human Rights Practices*, 22, 21 (Feb. 25, 2000) (ellipsis in original).

In *Ding* we held that the petitioner had been forced to have an abortion although she, like Li Zhen, had not gone into hiding before the abortion. *Id.* at 1137-38.

**[5]** Third, the IJ stated that the abortion was not performed "pursuant to any official summons" or by "family planning officials," but rather was performed by Li Zhen's employer. This distinction does not support a conclusion that the abortion was not forced within the meaning of § 1101(a)(42)(B). The record in this case establishes that the structure of the Chinese population control program is a "top to bottom system," involving "coordinat[ion] of all departments and all fields in excellent implementation of 'planned-birth work.' " *Forced Abortion and Sterilization in China: The View From the Inside*: *Before the Subcomm. on International Operations and Human Rights of the H. Comm. on International Relations*, 105 Cong. (1998) (statement of Harry Wu, Executive Director, Laogai Research Foundation). Such coordination, including the dismissal or demotion of violators by "[p]ersonnel departments," indicates that the structure of China's population control program involves actors other than official summoners and family planning officials. *Id.* In this case, the policy implemented by Li Zhen's employer required her to have an abortion because of her age and lack of official marriage. This policy corresponds exactly with the official Chinese population control policies and can only be seen as an implementation of those policies.

For the first time on petition for review, the government argues to us that the IJ made an erroneous factual finding in holding that Tang and Li Zhen were married within the meaning of § 1101(a)(42)(B). The evidence does not compel a result contrary to the finding of the IJ. *See Gu*, 454 F.3d at 1018-19. Indeed, the record supports his conclusion. For example, Tang testified that Li Zhen discovered that she was pregnant "after they began living together as husband and wife."

**[6]** Tang raised a separate claim for asylum eligibility based on his labor activities in Guam. Because we find that Tang is eligible for asylum under § 1101(a)(42)(B), we do not reach this second claim.

## B. Withholding of Removal Eligibility for Forced Abortion

**[7]** Tang also argues that his application for withholding of removal should be granted because of the forced abortion performed on Li Zhen. *See Wang v. Ashcroft*, 341 F.3d 1015, 1022 23 (9th Cir. 2003) (concluding that victim of forced abortion was entitled to withholding of removal). In *Qu v. Gonzales*, 399 F.3d 1195 (9th Cir. 2005), we held that victims of forced sterilization were "entitled, without more, to withholding of removal." *Id.* at 1203. After detailing the extensive regulatory and statutory history of population control policies, we held that forced sterilizations are a unique form of persecution that cause continuous and permanent effects. *Id.* at 1202. Although the issue was not before us, we noted in a footnote that a forced abortion is sufficiently like a forced sterilization that it "likely result[s] in statutory entitlement to asylum eligibility and withholding of removal." *Id.* at 1202 n.8.

**[8]** Both forced abortion and forced sterilization share "unusual characteristics" including the "pain, psychological trauma, and shame" resulting from a forced procedure. *Id.* Both forms of persecution have serious, ongoing effects. *Id.* A woman who has had a forced abortion has experienced unwanted governmental interference into one of the most fundamental and personal of decisions: whether she will have a child. The effects of that intrusion last a lifetime. In addition, the governmental infringement on a woman's bodily integrity during a forced abortion results in, as one Congressman described it, "one of the most gruesome human rights violations in the history of the world." 142 Cong. Rec. H2633 (daily ed. Mar. 21, 1996) (statement of Rep. Christopher

Smith). We see no way to distinguish between the victims of forced sterilization and the victims of forced abortion for withholding of removal eligibility purposes. We conclude that, like those who have undergone forced sterilization, victims of forced abortion are "entitled by virtue of that fact alone" to withholding of removal. *See Qu*, 399 F.3d at 1203.

## Conclusion

**[9]** We grant Tang's petition for review. First, we hold that the abortion performed on Li Zhen was "compell[ed], oblig-[ed], or constrain[ed] by mental, moral, or circumstantial means," *see Ding*, 387 F.3d at 1139, such that Tang has established asylum eligibility. We remand for the Attorney General to exercise discretion in deciding whether to grant asylum. Second, we hold that Tang, as the partner of a woman who had a forced abortion, is entitled to withholding of removal as a matter of law.

GRANTED in part; REMANDED in part.