REVISED September 5, 2007

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 23, 2007**

Charles R. Fulbruge III
Clerk

No. 05-60891

YUQING ZHU

Petitioner

v.

ALBERTO GONZALES, U.S. Attorney General

Respondent

Petition for Review of an Order of the Board of Immigration Appeals

Before HIGGINBOTHAM, WIENER, and CLEMENT, Circuit Judges.

WIENER, CIRCUIT JUDGE:

Petitioner Yuqing Zhu, a native and citizen of China, previously applied for asylum and withholding of removal, contending that she qualifies for both forms of relief, because she was subjected to a forced abortion in China. The Immigration Judge ("IJ") denied the application, concluding that Zhu's asylum application was untimely and that she was not forced to have an abortion but rather chose to do so voluntarily. The Board of Immigration Appeals ("BIA") affirmed without an opinion. In Zhu v. Ashcroft,[1] we vacated and remanded to the BIA with instructions to clarify its holding. On remand, the BIA again

---

[1] 382 F.3d 521 (5th Cir. 2004).

affirmed, agreeing with the IJ and finding that the application was untimely and that Zhu "chose to have an abortion." Zhu then filed this petition for review of the BIA's order.

Although we do not have jurisdiction to review the decisions that Zhu's asylum application was untimely, we do to review the denial of her petition to review her application for withholding of removal — and we do so now. We conclude that Zhu's abortion was indeed forced, as a reasonable person in Zhu's position "would objectively view the threats for refusing the abortion to be genuine," and that harm, "if carried out, would rise to the level of persecution."[2] Thus, as Zhu was subjected to past persecution, we presume that her "life or freedom would be threatened in the future in [China]."[3] Accordingly, Zhu qualifies for withholding of removal as a matter of law. We reverse the judgment of the BIA regarding Zhu's entitlement to withholding of removal and remand to the BIA with instructions to enter an order withholding removal, in accordance with this opinion.

## I. FACTS AND PROCEEDINGS

As the facts of this case are fully set forth in Zhu v. Ashcroft,[4] we summarize them only briefly here. In 1994, while still in China, Zhu, who was unmarried, became pregnant by her boyfriend. Then, as now, China's family planning policies prohibited unmarried women from having children. Zhu and her boyfriend would not have been allowed to marry and thereby avoid that prohibition, because they would have been forced to undergo medical testing, which would have revealed her pregnancy and barred their marriage. The IJ credited Zhu's testimony that she believed that Chinese law required her to have

---

[2] In re T-Z-, 24 I. & N. Dec. 163, 168 (BIA 2007) (defining forced abortion).

[3] 8 C.F.R. § 208.16(b)(1)(I).

[4] 382 F.3d 521.

an abortion; indeed, she had heard of one woman who had been forced to undergo an abortion in her ninth month of pregnancy. This is borne out by the 1999 State Department Country Conditions Report on Human Rights in China ["The 1999 Country Conditions Report"], which indicates that, although contrary to official government policy, forced and coerced sterilizations and abortions continue to occur, as family planning officials are under "intense pressure to meet family planning targets set by the Government."[5] The IJ also credited Zhu's testimony that she believed that she might lose her job, its benefits, and her housing if she did not undergo an abortion. The 1999 Country Conditions Report states that

> [d]isciplinary measures against those who violate policies can include fines (sometimes called a "fee for unplanned birth" or a "social compensation fee"), withholding of social services, demotion, and other administrative punishments that sometimes result in loss of employment. Fines for giving birth without authorization vary, but they can be a formidable disincentive.[6]

And the IJ credited Zhu's testimony that children born to unmarried women are not recognized as citizens, and are denied admission to school and refused medical treatment. In the face of all this governmental duress, Zhu concluded that she had no choice but to have an abortion. In 1997, Zhu became pregnant again. She did not want to have another abortion, because of the pain and loss she felt as a result of her first abortion, and because she was concerned about her health. Believing that she faced the possibility of imprisonment, fines,

---

[5] Dep't of State Country Reports on Human Rights Practices China 1999, available at http://www.state.gov/g/drl/rls/hrrpt/1999/284.htm. Although we cite to the 1999 Country Conditions Report, human rights abuses relating to China's family planning policies persist. See Dep't of State Country Reports on Human Rights Practices China 2006, available at http://www.state.gov/g/drl/rls/hrrpt/2006/78771.htm. We cite the 1999 report because it was admitted into evidence at the hearing before the IJ.

[6] Dep't of State Country Reports on Human Rights Practices China 1999, available at http://www.state.gov/g/drl/rls/hrrpt/1999/284.htm.

unemployment, abortion, and possibly even sterilization if she did not have an abortion, she decided to try to come to the United States, where she hoped to give birth. She obtained a business visa through her work, and entered the United States in October 1997. Her daughter was born in the United States in May 1998. Zhu received various extensions on her business visa, after which she received student and work visas. She stopped working in June 1999, and the Immigration and Naturalization Service ("INS") terminated her legal status in April 2000. In October 2000, she applied for asylum, withholding of removal, relief under the Convention Against Torture ("CAT"), and, only in the alternative, for a voluntary departure.

After a hearing in which Zhu testified, the IJ denied her application for asylum, withholding of removal, and relief under CAT. The IJ concluded that Zhu's application was untimely, as she had filed it more than a year after arriving in the United States. The IJ also held that she did not qualify for an exception to the one-year filing deadline. In so holding, the IJ stated that "filing the asylum application some 6½ months after her nonimmigrant status . . . expired and some 3 years after her initial arrival in the United States is not reasonable." The IJ also addressed the merits of her claim, concluding that Zhu was credible, but that, as a matter of law, she had not been forced to have an abortion. Rather, ruled the IJ, she "voluntarily went to have the abortion upon the belief that she need[ed] to abide by the law and that she had no other way out, other than having an abortion." In so holding, the IJ temporized that Zhu had "to take responsibility for her own personal choices and her personal choice of having a child."[7] The IJ ruled that Zhu was removable and granted Zhu

---

[7] As we observed in our first Zhu opinion, the IJ's decision is replete with moralistic commentary on Zhu's decision to have two relationships out-of-wedlock. See Zhu, 382 F.3d at 526 n.2 (noting "the highly inappropriate and facially sexist commentary by the IJ that is pervasive in his opinion and often is substituted for what should have been a thorough legal analysis of Ms. Zhu's asylum petition.").

voluntary departure. Zhu appealed to the BIA, and the BIA affirmed without an opinion.

On appeal, we vacated the BIA's dismissal and remanded with instructions that the BIA issue an opinion clarifying its reasons for dismissing Zhu's appeal. An opinion was necessary, we noted, because we had "no way of knowing whether the BIA affirmed the IJ's decision on a non-reviewable basis, i.e., untimeliness, or a reviewable basis, i.e., the merits of Zhu's asylum claim."[8] We then specified the issues that needed to be addressed on remand:

> [S]hould the BIA decide upon remand that Zhu's application for asylum was timely or her untimeliness is excused, the merits of her asylum application should be addressed. Most significantly, "forced" under 8 U.S.C. § 1101(a)(42) needs to be defined and whether Zhu meets such definition and therefore can be considered to have suffered past persecution needs to be determined. If unsatisfied with the BIA's resolution, Zhu can appeal. If, however, the BIA finds Zhu's application to be timely but decides not to address the merits of her claim and merely affirms the IJ's decision, then Zhu can appeal such a decision to this Court and this Court will then review the IJ's decision as the final agency determination concerning the merits of her claim. Further, even if the BIA determines that Zhu's application for asylum was not timely filed, the issue of whether Zhu was eligible for withholding of removal remains because there is no time bar in seeking withholding of removal. Again, here some similar but not identical unsolved issues should be addressed by the BIA on remand, most importantly whether Zhu has suffered past persecution or if she has a well-founded fear of future persecution. The BIA, utilizing its expertise as an agency skilled in making such evaluations, can address these issues and, if unsatisfied, Zhu can appeal. If the BIA decides not to address the withholding of removal claim, then the IJ's decision is a final agency determination subject to review again in this Court. In other words, we are neither deciding the merits of Zhu's claim

---

[8] Id. at 527. Our holding in Zhu was issued prior to the passage of the Real ID Act of 2005. As we explain below, that Act gives us jurisdiction to review timeliness determinations to the extent they turn on a question of law. See Nakimbugwe v. Gonzales, 475 F.3d 281, 284 (5th Cir. 2007) (per curiam) (reviewing timeliness determination because it turned on statutory construction).

5

nor prohibiting her from pursuing the merits of her claim at some later date.[9]

On remand, the BIA issued a terse opinion, holding that the IJ did not err in "finding the respondent's application for asylum untimely, without adequate excuse, or . . . in his alternative denial of her application on the merits." Specifically, the BIA stated,

> [w]ith regard to timeliness, we adopt and affirm the [IJ]'s ruling that the application for asylum was untimely filed and did not satisfy any of the regulatory excuses for such untimeliness. . . . [I]n this case, we agree with the [IJ] that the respondent failed to file her asylum application within a reasonable amount of time. Furthermore, we agree with the [IJ]'s finding that the respondent failed to establish past persecution or a well-founded fear of future persecution. We note that the respondent testified that the government did not force her to have the abortion, nor did she have any problems with the government due to her pregnancy. From the record, it appears that the respondent made a decision and chose to have an abortion.

Thus, despite our clear instruction, the BIA did not define the term "forced" under 8 U.S.C. § 1101(a)(42). It dismissed Zhu's appeal of the IJ's denial of her petition. Zhu filed this petition, challenging the BIA's order.[10]

## II. APPLICABLE LAW AND ANALYSIS

A.    Standard of Review

We generally have authority to review only the decision of the BIA.[11] When the IJ's ruling affects the BIA's decision, however, we also review the

---

[9] Zhu, 382 F.3d at 527-29 (internal citations omitted).

[10] As Zhu does not challenge the dismissal of her CAT claim in her brief, we consider it waived. See Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994).

[11] Majd v. Gonzales, 446 F.3d 590, 594 (5th Cir. 2006).

decision of the IJ.[12] With respect to timeliness, the BIA expressly adopted and affirmed the IJ's findings and holding, so we review the IJ's decision on that issue.[13] With respect to the merits, the BIA did not expressly adopt the IJ's findings. It did, however, state, as quoted earlier:

> Furthermore, we agree with the [IJ]'s finding that the respondent failed to establish past persecution or a well-founded fear of future persecution. We note that the respondent testified that the government did not force her to have the abortion, nor did she have any problems with the government due to her pregnancy. From the record, it appears that the respondent made a decision and chose to have an abortion.

Considering the paucity of findings of fact, the conclusional perfunctoriness of the BIA's opinion — particularly in light of its ignoring our explicit instructions to make specified legal determinations on remand — and the BIA's initial decision affirming the IJ's ruling without opinion, there is no question but that the IJ's decision affected the BIA's decision with respect to the merits as well. Thus, we also review the IJ's findings and holding on the merits.

We review factual findings of the BIA and IJ for substantial evidence, and questions of law de novo,[14] giving "considerable deference to the BIA's interpretation of the legislative scheme it is entrusted to administer."[15]

---

[12] Nakimbugwe, 475 F.3d at 283; Majd, 446 F.3d at 594; Beltran-Resendez v. INS, 207 F.3d 284, 286 (5th Cir. 2000). The government inexplicably argues that, because "the BIA's order dismissing Zhu's appeal adopted and affirmed the decision and findings of the IJ[,] . . . only the BIA's decision is reviewed by this Court." This directly contradicts our precedent. See, e.g., Majd, 446 F.3d at 594 (reviewing IJ's decision when BIA expressly adopted and affirmed IJ's ruling). Indeed, the case cited by the government, Beltran-Resendez, indicates that we "consider the Immigration Judge's decision only to the extent that it affects the BIA's decision." 207 F.3d at 286 (emphasis added).

[13] See Majd, 446 F.3d at 594 (reviewing the IJ's decision when BIA expressly adopted and affirmed IJ's ruling).

[14] Nakimbugwe, 475 F.3d at 283.

[15] Fonseca-Leite v. INS, 961 F.2d 60, 62 (5th Cir. 1992) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)).

Although we may reverse a decision on a factual finding only when the evidence compels us to do so, "we nevertheless may reverse an IJ's decision if it was decided on the basis of an erroneous application of the law."[16]

B.     Asylum

An alien is eligible for asylum if the Attorney General or the Secretary of Homeland Security determines that the alien is a refugee.[17]  A refugee is defined as an individual "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [his or her country of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[18]  "The Attorney General [or the Secretary of Homeland Security] has complete discretion whether to grant asylum to eligible individuals."[19]

To be eligible for asylum, an alien must file an application within one year of his or her arrival in the United States.[20]  The one-year filing deadline, however, may be excused if the applicant can demonstrate "changed circumstances which materially affect[ed] the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application."[21]  "Extraordinary circumstances" include those in which the applicant maintained lawful immigrant status until a reasonable period before the filing of an asylum

---

[16]  Eduard v. Ashcroft, 379 F.3d 182, 186 (5th Cir. 2004) (reversing because IJ erroneously applied law to facts); Mikhael v. INS, 115 F.3d 299, 305 (5th Cir. 1997) (reversing because IJ applied wrong standard of proof).

[17]  8 U.S.C. § 1158(b)(1)(A).

[18]  8 U.S.C. § 1101(a)(42).

[19]  Majd, 446 F.3d at 595; 8 U.S.C. § 1158(b)(1)(A).

[20]  8 U.S.C. § 1158(a)(2)(B).

[21]  8 U.S.C. § 1158(a)(2)(D).

application.[22] To the extent that a determination of timeliness turns on a constitutional claim or a question of law, we have jurisdiction to review it under the Real ID Act.[23] Even after the passage of the Real ID Act, however, we do not have jurisdiction to review determinations of timeliness that are based on findings of fact.[24]

Zhu concedes that she did not file her application within one year following her arrival in the United States. She nevertheless contends that "extraordinary circumstances" excuse that failure, viz., that she applied for asylum within a "reasonable period" following the termination of her lawful immigrant status.[25] Zhu's legal immigrant status terminated in April 2000.[26] She filed her application for asylum approximately six months later, in October 2000. The IJ ruled, and the BIA expressly adopted and affirmed, that Zhu did not file the asylum application within a reasonable time after the termination of her legal status. Specifically, the IJ held that "filing the asylum application some 6½

---

[22] 8 C.F.R. § 208.4(a)(5)(iv).

[23] Nakimbugwe v. Gonzales, 475 F.3d 281, 284 (5th Cir. 2007) (per curiam).

[24] Id. In her brief, which was submitted before our decision in Nakimbugwe, Zhu contends that "the Court now has jurisdiction to consider all issues raised by Petitioner before the [IJ] and the BIA." (Emphasis added). Whatever potential merit this contention may have had before Nakimbugwe, the argument is now foreclosed, as we clarified in Nakimbugwe that we do not have jurisdiction to review determinations of timeliness to the extent they turn on findings of fact.

[25] Zhu also argues that "changed circumstances" exist to allow consideration of her application. She does not specify what circumstances have changed so as to alter her eligibility for asylum. The grounds on which she argues she is eligible for relief — past or future persecution due to China's family planning laws — existed as a basis for eligibility for asylum when she arrived in the United States.

[26] After receiving various visa reclassifications and extensions, Zhu obtained a non-immigrant worker H1-1B visa that was valid from January 1999 until December 2001. After she quit her job to care for her sick daughter in June 1999, she applied for and was granted a change in status to a nonimmigrant visitor permitted to remain in the United States until November 18, 1999. Her application for an extension of that visa was denied in April 2000.

months after her nonimmigrant status has expired and some 3 years after her initial arrival in the United States is not reasonable."

Anticipating the distinction that we have delineated between our jurisdiction to review questions of law and questions of fact, Zhu argues to us that "the exceptions to the one year filing requirement are 'questions of law' that may . . . be reviewed under INA § 242(a)(2)(D)." Thus, she urges, we may review the IJ's ruling that her application was not filed within a reasonable time after the termination of her legal status. This argument fails. Although our decision in Nakimbugwe v. Gonzales illustrates that there are some circumstances when a challenge to a finding on timeliness will involve a reviewable "question of law,"[27] Zhu's is not such a case. In Nakimbugwe, we explained that "[m]any determinations of timeliness are based on an IJ's assessment of facts and circumstances that affected the applicant's filing, and even after the passage of the Real ID Act, such rulings are clearly unreviewable by this Court."[28] As an example, we pointed out that

> Nakimbugwe also challenges the IJ's (and the BIA's) determination that she failed to demonstrate extraordinary circumstances preventing her from filing for asylum within a year. This challenge turns entirely on a question of fact, and this Court therefore has no jurisdiction to consider it, even after the passage of the Real ID Act.[29]

---

[27] Id.; Diallo v. Gonzales, 447 F.3d 1274, 1281-82 (10th Cir. 2006) (reviewing timeliness determination because it turned on question of law). But see Sokolov v. Gonzales, 442 F.3d 566, 568-69 (7th Cir. 2006) (holding that courts of appeal do not have jurisdiction to review timeliness determinations); Chacon-Botero v. U.S. Att'y Gen., 427 F.3d 954, 957 (11th Cir. 2005) (per curiam) (same).

[28] Nakimbugwe, 475 F.3d at 284.

[29] Id. at 284 n.1.

Here, the IJ's determination on timeliness turned on the "IJ's assessment of facts and circumstances that affected" Zhu's filing.[30] In concluding that 6 months was not a reasonable period of time, the IJ noted that Zhu had consulted with lawyers about a possible asylum application during the three years before her legal status was terminated. The IJ also observed that, even though Zhu purportedly came to the United States seeking refuge, she "applied for a number of extensions and adjustment of status, but claimed she was too busy with taking care of her child or with her work or with her school" to apply for asylum. Thus, the IJ's rejection of Zhu's extraordinary-circumstances claim was based on an evaluation of the facts and circumstances of her case. We do not have jurisdiction to review the IJ's determination that Zhu's asylum application was untimely.[31]

## C. Withholding of Removal

Zhu also applied for withholding of removal. Unlike an application for asylum, an application for withholding of removal need not be filed within one

---

[30] Id. at 284.

[31] Id.; see also Joaquin-Porras v. Gonzales, 435 F.3d 172, 180 (2d Cir. 2006) ("[T]he IJ looked to 'the facts and the circumstances as presented in this case' and concluded that [the applicant] did not qualify for an exception. We therefore conclude that we cannot disturb the IJ's conclusion that [the applicant] was not entitled to file past the one-year deadline because of changed or extraordinary circumstances.") (citation omitted); Sukwanputra v. Gonzales, 434 F.3d 627, 635 (3d Cir. 2006) (holding that claim that petitioner demonstrated changed or extraordinary circumstances does not raise a "question of law covered by the Real ID Act's judicial review provision").

We note that the Ninth Circuit recently held that the Courts of Appeals have jurisdiction to review mixed questions of fact and law, which the court concluded include determinations with respect to changed circumstances. Ramadan v. Gonzales, 479 F.3d 646, 654-57 (9th Cir. 2007). Nakimbugwe counsels against adopting this approach here, as we expressly observed that we do not have jurisdiction to review timeliness determinations that are based on an assessment of the facts and circumstances of a particular case. Moreover, in explaining the category of issues that we have jurisdiction to review in Nakimbugwe, we quoted a Second Circuit opinion, in which it clarified that "questions of law," as used in the Real ID Act, "refers to 'a narrow category of issues regarding statutory construction.'" 475 F.3d at 284 n.2 (quoting Xiao Ji Chen v. U.S. Dep't of Justice, 434 F.3d 144, 154 (2d Cir. 2006)).

year following entry.[32]  Also unlike asylum, withholding of removal is not discretionary,[33] as "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."[34]  Importantly to our consideration today, when an applicant for withholding of removal has suffered past persecution, "it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim."[35]  This presumption may be rebutted, but only if the government can prove by a preponderance of the evidence that (1) there has been a fundamental change of conditions that removes the threat to the applicant, or (2) the applicant could avoid the threat by relocating to another part of the country.[36]  In contrast, "[i]f the applicant's fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm,"[37] i.e., that there is a "clear probability" of future harm.[38]

### 1.   Past Persecution

Zhu insists that she is entitled to withholding of removal, because she suffered past persecution in the form of a forced abortion.  In determining entitlement to withholding of removal, "a person who has been forced to abort

---

[32] Zhu v. Ashcroft, 382 F.3d 521, 528 (5th Cir. 2004) (citing 8 U.S.C. § 1231(b)(3)(A)).

[33] Majd v. Gonzales, 446 F.3d 590, 595 (5th Cir. 2006).

[34] 8 U.S.C. § 1231(b)(3)(A) (emphasis added).

[35] 8 C.F.R. § 208.16(b)(1)(I).

[36] 8 C.F.R. § 208.16(b)(1)(I), (ii).

[37] 8 C.F.R. § 208.16(b)(1)(iii).

[38] Chen v. Gonzales, 470 F.3d 1131, 1138 (5th Cir. 2006).

a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion."[39]  Without defining the meaning of the term "forced" in the context of § 1101(a)(42), as we had instructed in our remand, both the BIA and the IJ baldly concluded that Zhu was not subjected to a "forced" abortion, but rather chose to abort her pregnancy voluntarily.  This conclusion was premised on a fundamental misinterpretation of the term "forced": It is obvious that the BIA and the IJ assumed that an abortion is "forced" only when it is physically compelled.  After oral argument in this case, however, the BIA held in Matter of T-Z- that

> whether an abortion is "forced" within the meaning of the coercive population control provisions should be evaluated in terms of whether the applicant would have otherwise been subjected to harm of sufficient severity that it amounts to persecution.  Therefore, an abortion is "forced" within the meaning of the Act when a reasonable person would objectively view the threats for refusing the abortion to be genuine, and the threatened harm, if carried out, would rise to the level of persecution.[40]

The BIA further clarified, in Matter of T-Z-, that an abortion may be "forced" even if it is not physically compelled.[41]

Based on the facts found by the IJ and the State Department Country Condition Report, plus the mass of federal cases depicting abuses of China's

---

[39] 8 U.S.C. § 1101(a)(42).  "[T]he population control-based persecution language of section 101(a)(42) applies to all relevant determinations under the Act, not just asylum determinations." In re X-P-T-, 21 I. & N. Dec. 634, 637 (BIA 1996) (holding that person who had been forcibly sterilized was eligible for withholding of removal).

[40] 24 I. & N. Dec. 163, 168 (BIA 2007).

[41] Id. at 169.  The BIA noted that "[t]he term 'persecution' is not limited to physical harm or threats of physical harm and may include threats of economic harm, so long as threats, if carried out, would be of sufficient severity that they amount to past persecution."

family planning laws, we have no trouble concluding that Zhu's 1994 abortion falls within Matter of T-Z-'s definition of forced abortion.[42] Zhu testified, and the IJ found credible, that she believed she faced the possibility of a physically compelled abortion later in her pregnancy, imprisonment, and even sterilization if she did not abort her pregnancy. As noted earlier, Zhu testified that she had heard of an unmarried woman being physically compelled to have an abortion in the ninth month of her pregnancy; and Zhu believed that, if she did not have the abortion, the child would not be recognized as a Chinese citizen and would be denied social services.[43] As the IJ found, "it was the law that convinced her

---

[42] The BIA's definition, particularly its discussion of when economic pressures would be sufficient to "force" an abortion, may not be reconcilable with our interpretation of the word "forced" in other contexts. Black's Law Dictionary defines force, in part, as meaning "to compel by physical means or by legal requirement." BLACK'S LAW DICTIONARY 673 (8th ed. 1999). Similarly, the American Heritage Dictionary defines force as meaning "to make a person or thing follow a prescribed or dictated course." AMERICAN HERITAGE DICTIONARY 513 (1976). "Force is broadly applicable to any such act and usually implies the exertion of physical strength or the operation of circumstances that permit no alternative to compliance." Id. (second emphasis added). Consistent with these definitions, we have held that the use of "'forced' does not necessarily imply a physical assault. To 'force' means to compel 'by physical, moral, or intellectual means,' or 'to impose' or 'to win one's way.'" United States v. Hefferon, 314 F.3d 211, 226 (5th Cir. 2002) (interpreting U.S.S.G. § 2A3.1(b)(5)) (quoting WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 326 (1970)). In defining "forced abortion," the Ninth Circuit has held that "an asylum applicant seeking to prove that he was subjected to a coercive family planning policy need not demonstrate that he was physically restrained during a 'forced' procedure. Rather, 'forced' is a much broader concept, which includes compelling, obliging, or constraining by mental, moral, or circumstantial means, in addition to physical restraint." Ding v. Ashcroft, 387 F.3d 1131, 1139 (9th Cir. 2004).

Although it is not immediately apparent to us why a different definition of forced should apply in the immigration context, we need not resolve this issue. As we would interpret "forced abortion" at least as broadly as the BIA, and we find that Zhu's abortion falls within this definition, we assume without deciding that the BIA's definition of forced in Matter of T-Z- is permissible.

[43] See Chen v. Ashcroft, 381 F.3d 221, 223 (3d Cir. 2004) (petitioner's girlfriend had been forced to have an abortion in her eighth month of pregnancy).

Although the BIA noted that Zhu testified that the government did not "force" her to have an abortion, it takes this statement out of context. A full reading of Zhu's testimony demonstrates that, although the government did not physically compel her to have an abortion, she decided to abort her pregnancy because of the legal ramifications and her belief that she had no other choice.

to have the abortion" and Zhu "went to have the abortion upon the belief that she need[ed] to abide by the law and that she had no way out."[44] We are left with no doubt that a reasonable person in Zhu's position would objectively believe these potential harms to be very real and genuine. Federal cases are replete with examples of Chinese women in Zhu's position being forced to abort their pregnancies or being forcibly sterilized.[45] In addition, the 1999 Country Conditions Report notes that forced abortions and sterilizations occurred despite China's official policy. None question that the threat of a physically compelled abortion or forcible sterilization rises to the level of persecution.[46] Again, we are satisfied that a reasonable person in Zhu's position "would objectively view the threats for refusing the abortion to be genuine, and the threatened harm, if carried out, would rise to the level of persecution."[47]

The government nevertheless contends that Zhu's abortion was not forced, because, it asserts, (1) her boyfriend rather than the government forced her to have the abortion, and (2) "the government could not force her to the point of persecution," as "[t]he government never knew of either of Zhu's pregnancies." We disagree.

---

[44] Despite so finding, the IJ concluded that Zhu's decision to have an abortion was "voluntary."

[45] Zi Zhi Tang v. Gonzales, 489 F.3d 987 (9th Cir. June 6, 2007); Chen v. Ashcroft, 381 F.3d 221 (3d Cir. 2004); In re T-Z-, 24 I. & N. Dec. 163, 168 (BIA 2007); In re S-L-L-, 24 I. & N. Dec. 1 (BIA 2006), rev'd on other grounds; Lin v. U.S. Dep't of Justice, __F.3d__, 2007 WL 2032066 (2d Cir. July 16, 2007) (en banc); In re Y-T-L-, 23 I. & N. Dec. 601 (BIA 2003); In re X-P-T-, 21 I. & N. Dec. 634, 637 (BIA 1996).

[46] 8 U.S.C. § 1101(a)(42). We also note that Matter of T-Z- suggests that the threat that a child might not be registered in China may also rise to the level of persecution. There, the BIA remanded for a determination of whether the financial threats made the abortion forced. In remanding, the BIA specifically noted that the petitioner had not mentioned that fear of sterilization or that her child would not be registered motivated her to have the abortion.

[47] In re T-Z-, 24 I. & N. Dec. at 168.

First, in the face of the negative legal, social, and economic ramifications of the pregnancy – including the possibility of sterilization or a physically compelled abortion later in the pregnancy – the additional fact that Zhu's boyfriend may have wanted her to have an abortion does not keep the abortion from having been compelled by the government. As we have noted, the IJ found that it was "the law" that convinced Zhu to abort her pregnancy. Under all relevant facts of Zhu's case, this is sufficient to make her abortion "forced."

Second, the government cannot prevail on its argument that Chinese authorities, because they were not aware that she was pregnant, could not have forced Zhu to abort her pregnancy. As Zhu observes, the fact of her pregnancy "was going to become public knowledge sooner or later." At the time, she believed that she would be compelled to have an abortion or be sterilized (or both) when her pregnancy was discovered, as it was bound to be, sooner or later. We see this belief as reasonable, especially in light of the multitude of federal cases that describe just such a pattern of events. Zhu elected to have an abortion in the tenth week of pregnancy, before it was discovered, rather than waiting until its unavoidable discovery by authorities at a time when she might be physically compelled to abort the pregnancy. It is true that, when faced with the Catch 22 options of an abortion at three months or an abortion later in the pregnancy, Zhu "chose" to have an abortion at three months, clearly the lesser of the two evils. But, given Zhu's perception that the abortion was inevitable, we cannot say that her decision to abort the pregnancy was "voluntary" or that it was not "forced." Indeed, at oral argument, the government itself demonstrated the extent to which Zhu's decision was compelled when it suggested – incredibly – that the abortion was not forced because Zhu could have avoided it by fleeing China. We hold that Zhu suffered past persecution.

2. Future Harm

As Zhu suffered past persecution in China, a regulatory presumption arises that she would face future persecution if she returned to China.[48] The government nevertheless urges that the presumption of future persecution does not apply in this case. Specifically, the government contends, in the alternative, that (1) the presumption of future persecution does not apply when the past persecution was a forced abortion, and (2) even if it did, conditions in China have now changed.

### a. Applicability of the Presumption to Forced Abortion

With respect to the government's contention that the presumption does not apply when the past persecution is a forced abortion, the regulatory text and the BIA's own reading of that text belie this argument and show that, to the contrary, the presumption indeed does apply. The regulations specify that

> [i]f the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim.[49]

"Forced abortions," which are categorized by statute as persecution based on political opinion, are nowhere exempted from this provision, and the government has provided no explanation whatsoever why we should exempt this form of persecution from the regulatory presumption.

The BIA's interpretation of the regulations supports our conclusion that the presumption applies to forced abortions. The BIA has held that an individual who has been forcibly sterilized is entitled to a presumption of future

---

[48] 8 C.F.R. § 208.16(b)(1)(I). As we hold that Zhu suffered past persecution, we do not address her contention that she would face a clear probability of future harm if she returned to China with her child, who was conceived in China in violation of the family planning policies.

[49] Id.

persecution even though, by definition, this particular form of persecution is not susceptible of repetition.[50]  Entitlement to the presumption pertains, because prior forced sterilization is a "permanent and continuing act of persecution."[51] Although the BIA has not explicitly extended this rationale to forced abortions, it has noted the close identity between these two forms of persecution: "[T]he forced abortion, like sterilization, 'deprive[s] a couple of the natural fruits of conjugal life, and the society and comfort of the child or children that might eventually have been born to them.'"[52]  In rejecting the government's argument that sterilization constituted a "changed circumstance" that rebuts the presumption of future harm, the BIA also observed that

> it is fair to assume that if the respondent's spouse was subjected to a forced abortion, as opposed to a forced sterilization, the possibility of the spouse becoming pregnant and being subject to another forced abortion would preclude the argument that the forced abortion constitutes a "fundamental change" in circumstances for purposes of the regulation.  We do not believe that it would be consistent with the intent of Congress for us to grant asylum to those subjected to a forced abortion, while denying relief to those subjected to a forced sterilization, simply because only the former act of persecution is one capable of repetition.[53]

From this, it is obvious that the BIA accepts that the regulatory presumption applies in cases involving forced abortions to the same extent that it does in those involving forced sterilizations.

In further support of our rejection of the government's position that the presumption does not apply to forced abortion, the Ninth Circuit was recently

---

[50] In re Y-T-L-, 23 I. & N. Dec. 601, 607 (BIA 2003); In re X-P-T-, 21 I. & N. Dec. 634, 637 (BIA 1996).

[51] In re Y-T-L-, 23 I. & N. Dec. at 607 (emphasis added).

[52] In re S-L-L-, 24 I. & N. Dec. 1, 7 (BIA 2006), rev'd on other grounds; Lin v. U.S. Dep't of Justice, __F.3d__, 2007 WL 2032066 (2d Cir. July 16, 2007) (en banc).

[53] In re Y-T-L, 23 I. & N. Dec. at 607.

confronted with the same issue that is before us today and held that a woman who had been subjected to a forced abortion was entitled to withholding of removal. In so holding, it stated that

> [b]oth forced abortion and forced sterilization share "unusual characteristics" including the "pain, psychological trauma, and shame" resulting from a forced procedure. Both forms of persecution have serious, ongoing effects. A woman who has had a forced abortion has experienced unwanted governmental interference into one of the most fundamental and personal of decisions: whether she will have a child. The effects of that intrusion last a lifetime. . . . We see no way to distinguish between the victims of forced sterilization and the victims of forced abortion for withholding of removal eligibility purposes.[54]

We agree that there is no reasoned basis for distinguishing between these two recognized forms of persecution in the context of withholding of removal. Thus, we hold that the presumption of future harm applies equally to forced abortions.

b.    Fundamental Change in Country Conditions

The government contends in the alternative that "[a]pplication of the presumption . . . raise[s] new fact questions about changed circumstances," because, in Matter of C-C-,[55] the BIA determined that "there has been a fundamental change in country conditions and that forced, coercive abortions and sterilizations are no longer part of China's population control."[56] This argument also fails, as the government overstates the holding of Matter of C-C-: There, the BIA did not in any way comment on whether forced abortions

---

[54] Zi Zhi Tang v. Gonzales, 489 F.3d 987, 992 (9th Cir. June 6, 2007) (internal citations omitted).

[55] 23 I. & N. Dec. 899 (BIA 2006).

[56] At oral argument, the government also urged that the official government policy of China prohibits coerced abortions. This claim is disingenuous. Even if China's party line is that forcible abortions are not performed, there is substantial evidence that contradicts this assertion, including an abundance of federal cases and the State Department Country Reports.

continue to occur as a result of China's population control policies.[57] Matter of C-C- involved a claim that the petitioner and her husband would be forcibly sterilized if they returned to China with their second child, who was born in the United States.[58] The BIA's discussion of China's population control policies was therefore limited to whether there was a "realistic chance" that the petitioner or her husband would be forcibly sterilized if they returned to China with two children, one of whom was born outside of China.[59] It did not address the extent to which conditions have changed with respect to abortions, sterilizations, and other coercive measures for unplanned pregnancies occurring in China. In fact, the only reference in that case to forced abortions is its observation that the 2005 State Department Country Reports "observed that central government policy 'formally prohibits the use of physical coercion to compel persons to submit to abortion or sterilization.' The Country Reports also noted, however, that some reports of physical coercion to meet birth targets continued, although the respondent's province was not mentioned among those which impose stringent measures to deal with out-of-plan pregnancies."[60]

Finally, the government advances that we would exceed our authority if we were to find that Zhu is entitled to withholding of removal. For support, the government cites INS v. Ventura's instruction that courts of appeal not decide questions that have not been decided by the agency in the first instance.[61] The government argues that, because a determination of past persecution in the form of forced abortion raises the regulatory presumption of future fear of forced

---

[57] Id. at 903-04.

[58] Id. at 900-01.

[59] Id. at 901-03.

[60] Id. at 903 (emphasis added).

[61] 537 U.S. 12, 16 (2002) (per curiam).

abortion, new legal and factual issues that the BIA did not address are raised, requiring remand. We disagree.

Even though the government had the burden of proving that the regulatory presumption should not apply, it never offered evidence to rebut the presumption before the IJ or before the BIA. Rather, the first time that the government argued that conditions have changed was in its May 9, 2007, letter to this court, eight years after Zhu filed her application for asylum and withholding of removal. Moreover, unlike in Ventura, where the BIA had not had the opportunity to decide whether conditions in the country of nationality had changed, we are satisfied that the BIA has rejected any contention that conditions in China have changed with respect to the treatment of women who become pregnant in violation of China's family planning policies (as distinguished from the treatment of Chinese citizens returning to China with children conceived and born abroad), as the BIA has granted relief to those who suffered persecution as a result of China's coercive planning provisions.[62]

In sum, the BIA has now had two opportunities to address the legal and factual issues that are again before this court; we need not give it a third bite at this apple. As there is no need or justification for further factual or legal development, we reverse the decision of the BIA, which "was decided on the basis of an erroneous application of the law,"[63] and hold that Zhu is entitled to withholding of removal as a matter of law.

### III. CONCLUSION

---

[62] In re Y-T-L-, 23 I. & N. Dec. 601 (BIA 2003); see also Zhao v. Gonzales, 404 F.3d 295, 311 (5th Cir. 2005) (concluding that, unlike Ventura, "[h]ere, . . . the Board has already rejected 'the changed country conditions' proposition, so our ruling on the persecution issue does not usurp the Board's authority to rule on it first"). In Zhao, we also noted that, "although the language in Ventura is strong, it remains precatory." Id.

[63] Eduard v. Ashcroft, 379 F.3d 182, 196 (5th Cir. 2004) (reversing because IJ erroneously applied law to facts); Mikhael v. INS, 115 F.3d 299, 305 (5th Cir. 1997); see also Chen v. Att'y Gen. of U.S., __ F.3d __, 2007 WL 1760658, at *7 (3d Cir. June 20, 2007).

We dismiss Zhu's petition for review of her asylum application for lack of jurisdiction. We reverse the BIA's denial of Zhu's application for withholding of removal, and hold that she is entitled to withholding of removal.

Petition for review of denial of asylum DISMISSED for lack of jurisdiction; Petition for review of denial of withholding of removal GRANTED; REMANDED to the BIA with instructions to enter an order withholding removal, in accordance with this opinion.