# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 8, 2012

No. 10-60982

Lyle W. Cayce
Clerk

ZOUBIR AL TILIMSANI BOUCHIKHI,

Petitioner

v.

ERIC H. HOLDER, JR., U. S. ATTORNEY GENERAL,

Respondent

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A097-202-599

Before REAVLEY, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Petitioner Zoubir Al Tilimsani Bouchikhi petitions for review of an order from the Board of Immigration Appeals (BIA) dismissing Bouchikhi's appeal from an Immigration Judge's (IJ) decision pretermitting his application for asylum and denying his application for withholding of removal. We DISMISS Bouchikhi's petition insofar as he challenges certain factual findings that we lack jurisdiction to review. In all other respects, the petition is DENIED.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-60982

## I. Background

Bouchikhi is a native and citizen of Algeria. He is a Muslim imam. He believes in democratic government, and he disapproves of the present Algerian regime because of its failure to permit democracy. As a moderate Muslim, Bouchikhi opposes the mistreatment of non-Muslims and the use of violence to establish an Islamist state.

After entering the United States in 1997 on a non-immigrant student visa, Bouchikhi received permission to remain as a special non-immigrant religious worker. That status was set to expire in December 2004. In May 2003 the Department of Homeland Security (DHS) denied Bouchikhi's petition to renew his religious worker classification, but in July 2003 DHS inadvertently granted a second petition. Bouchikhi applied for adjustment to immigrant status in October 2003. And in October 2005 he was granted advance parole, permitting him to travel outside of the United States without prejudicing his pending application for adjustment of status. He left the United States in January 2006 and returned in February 2006. DHS denied Bouchikhi's application for adjustment of status on March 9, 2007. DHS also revoked his non-immigrant religious worker status on March 9, 2007. Bouchikhi moved to reopen and reconsider the revocation but that motion was denied in November 2008.

In December 2008 Bouchikhi was served with a Notice to Appear, charging him with being removable as an alien not in possession of valid entry documents. Bouchikhi sought various forms of relief, including asylum and withholding of removal, for which he applied in April 2009. The IJ considered those applications at a hearing in April 2009.

Bouchikhi contended that the Algerian state oppresses any outspoken advocate of democracy or critic of its conduct. He also contended that various opposition groups in Algeria hold extreme religious views, and that they threaten violence against moderate religious leaders like himself. Bouchikhi

No. 10-60982

testified that before he moved to the United States he lived for seven years in Malaysia. After moving to the United States he returned to Algeria to visit his mother. Most of his family still resides in Algeria, including his parents and seven of his ten siblings. Bouchikhi attempted to present expert testimony of Dr. Shaul Gabbay, a professor at the University of Denver in the School of International Studies. Bouchikhi called Gabbay as an expert on religious extremism in the Muslim world, but the IJ did not permit Gabbay to testify because he is not an expert on Algeria.

The IJ found that Bouchikhi had failed to meet his burdens of proof with respect to his requests for relief from removal, including his asylum application and his application for withholding of removal. The IJ also found that Bouchikhi's asylum application was untimely. Under 8 U.S.C. § 1158(a)(2)(B), an alien must file his asylum application "within 1 year after the date of the alien's arrival in the United States." The IJ found that Bouchikhi's last arrival was in February 2006. The IJ found that Bouchikhi had failed to establish any extraordinary circumstance that would justify relaxing the one-year deadline under 8 U.S.C. § 1158(a)(2)(D).

The BIA dismissed Bouchikhi's appeal with a brief opinion in which the BIA explicitly affirmed and adopted the IJ's decision. Bouchikhi timely filed a petition for review in this court.

## II.  Jurisdiction

The court has jurisdiction to review constitutional claims or questions of law raised in a timely petition challenging an order of removal. 8 U.S.C. § 1252(a)(2)(D). We have authority to review only an order of the BIA, but our task is effectively to review the IJ's decision when the BIA has explicitly adopted it. *See Zhu v. Gonzales*, 493 F.3d 588, 593 (5th Cir. 2007). Generally, we have jurisdiction to review an IJ's determinations of fact under a substantial evidence standard. *Zhang v. Gonzales*, 432 F.3d 339, 343-44 (5th Cir. 2005). The IJ's

No. 10-60982

findings of fact are conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ."  8 U.S.C. § 1252(b)(4)(B).  But we lack jurisdiction to review findings of fact bearing on determinations of the timeliness of an asylum application.  *Zhu*, 493 F.3d at 594-95.

## III. Discussion

### A. Bouchikhi's Arrival

As noted above, 8 U.S.C. § 1158(a)(2)(B) requires an alien to file his asylum application "within 1 year after the date of the alien's arrival in the United States."  The Attorney General's implementing regulations require that "[t]he 1–year period shall be calculated from the date of the alien's last arrival in the United States."  8 C.F.R. § 1208.4(a)(2)(ii).  Bouchikhi's first argument presents a question of law regarding the meaning of "arrive" as it is used in these provisions.  The parties agree that Bouchikhi was paroled when he returned to the United States in February 2006, and that he was an "arriving alien" from then until his April 2009 asylum application.  Bouchikhi argues that his last "arrival" in the United States was a continuing event that began when he became an "arriving alien" and continued as long as he retained that status. He was therefore "still legally 'arriving' . . . years after he got off the plane," and his "asylum application should [not] be considered as filed more than a year after his 'arrival.'"

When construing statutes and regulations, we begin with the assumption that the words were meant to express their ordinary meaning.  *INS v. Elias-Zacarias*, 502 U.S. 478, 482, 112 S. Ct. 812, 816 (1992); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 595 (5th Cir. 2004).  In *Matter of F-P-R* the BIA interpreted "arrival" as it is used in § 1208.4(a)(2)(ii). 24 I & N Dec. 681, 682-83, Int. Dec. 3630, 2008 WL 4817462 (BIA 2008).  The BIA rejected the Second

4

Circuit's view[1] that "last arrival" in § 1208.4(a)(2)(ii) does not include arrivals after brief trips out of the United States. *Id.* "[L]ast arrival," the BIA explained, "refer[s] to an alien's most recent coming or crossing into the United States after having traveled from somewhere outside the country." *Id.* at 683. The BIA relied on the ordinary meaning of "arrive," which "is defined as 'to come to a certain point in the course of travel; reach one's destination' and 'to come to a place after traveling.'" *Id.* (citing THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 83 (unabridged ed. 1973)). Other authorities confirm that in ordinary usage "arrival" denotes an event that happens at a particular point in time rather than over a duration.[2]

Bouchikhi's three year stint as an "arriving alien" is no reason to depart from ordinary usage when applying 8 U.S.C. § 1158(a)(2) and 8 C.F.R. § 1208.4(a)(2)(ii). "Arriving alien" is a legal term of art explicitly defined in 8 C.F.R. § 1.2.[3] The definition takes in various categories of aliens who are physically present in the United States but for one reason or another are not yet admitted:

> Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or

---

[1] *Joaquin-Porras v. Gonzales*, 435 F.3d 172, 178-80 (2d Cir. 2006).

[2] *E.g.*, *Oxford English Dictionary Online*, http://www.oed.com/ (defining "arrive" as "To come to the end of a journey, to a destination, or to some definite place; to come upon the scene, make one's appearance."); *Merriam-Webster Online*, http://www.merriam-webster.com/ (defining "arrive" as "To reach a destination" or "to make an appearance").

[3] At the time of Bouchikhi's hearing, the definition was found in 8 C.F.R. § 1.1(q) (2009). The text has not been changed.

No. 10-60982

revoked. However, an arriving alien who was paroled into the United States before April 1, 1997, or who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act.

Some aliens remain in that situation for months or years. But that does not support Bouchikhi's theory that a fictionally prolonged "arriving" is continuously carried on during that time. Section 1.2's definition of "arriving alien" makes plain that applying the term to a person does not attribute any act of "arriving" to him at all. It merely conveys that he belongs to one of the various categories of aliens, none of whom 8 C.F.R. § 1.2 describes in terms of an act of "arriving." Moreover, Bouchikhi points to nothing indicating that 8 C.F.R. § 1.2's definition of "arriving alien" was intended to interpret or control every other use of "arrive" found in the I.N.A. or its implementing regulations. Notwithstanding his subsequent status as an "arriving alien," Bouchikhi's "arrival" for purposes of 8 U.S.C. § 1158(a)(2) and 8 C.F.R. § 1208.4(a)(2)(ii) occurred and was complete at the latest on the day in February 2006 that he returned the United States after traveling abroad.[4]

B. Extraordinary Circumstances

Title 8, United States Code, § 1158(a)(2)(D) relaxes the one-year deadline for an asylum application if "the alien demonstrates to the satisfaction of the Attorney General . . . extraordinary circumstances relating to the delay in filing an application within the [one-year] period . . . ." The implementing regulations require an alien seeking to prove extraordinary circumstances to also show that

---

[4] Bouchikhi's "arrival" occurred more than a year before his asylum application under both the BIA's interpretation of 8 C.F.R. § 208.4(a)(2)(ii) and the interpretation the Second Circuit adopted in *Joaquin-Porras*, 435 F.3d at 180. We express no view as to which interpretation is correct.

No. 10-60982

he "filed the application within a reasonable period given those circumstances." 8 C.F.R. § 1208.4(a)(5). Possible extraordinary circumstances include being paroled or maintaining lawful immigrant or nonimmigrant status "until a reasonable period before the filing of the asylum application . . . ." 8 C.F.R. § 1208.4 (a)(5), (a)(5)(iv).

Although the parties agree that Bouchikhi was an "arriving alien" from the beginning of his parole until April 2009, they disagree over when his parole terminated.[5] Bouchikhi contends that his parole continued until he received the notice to appear in December 2008. The IJ found that his parole ended in either October 2006, one year after issuance of the October 2005 advance parole permission, or in March 2007, when Bouchikhi's application for adjustment of status was denied.

A BIA finding regarding whether the period between an applicant's loss of legal status and his asylum application was reasonable is a determination of fact, which the we lack jurisdiction to review. *Zhu*, 493 F.3d at 594-95. The IJ found that Bouchikhi did not apply within a reasonable period, because he had been in the United States since December 1997, and "[w]aiting more than 11 years to file an asylum application [was] not reasonable in the Court's view." The BIA added: "assuming *arguendo* that the respondent established extraordinary circumstances in March 2007, the respondent did not file within a reasonable time period as provided for in 8 C.F.R. § 1208.4(a)(5)." Neither the BIA nor the IJ addressed whether a December-2008-to-April-2009 delay would have been reasonable.

We therefore turn to the issue of when Bouchikhi's parole ended. We find, however, that we lack jurisdiction over that issue as well, because in this case it turns on a question of fact. Under paragraph (e)(1) of 8 C.F.R. § 212.5, parole

---

[5] The "arriving alien" category includes paroled aliens as well as aliens whose parole has terminated. 8 C.F.R. § 1.2.

terminates without written notice when an alien departs from the United States, or at the expiration of the fixed period, if any, for which the parole was authorized. Paragraph (e)(2) provides that in other cases parole will terminate on receipt of written notice or receipt of a charging document. 8 C.F.R. § 212.5(e)(2)(i). Bouchikhi did not receive any notice prior to the December 2008 notice to appear, so when his parole terminated depends on whether his parole was authorized for a fixed period, and if so, when that period expired.

In his opening brief, Bouchikhi cites 8 C.F.R. § 212.5(e)(2) for the proposition that parole is terminated by written notice, and he then asserts that his parole continued until he received the notice to appear in December 2008. He does not address § 212.5(e)(1) or the possibility that his parole was authorized for a fixed period after which it would automatically expire without notice. But the IJ evidently found that his parole was authorized for a period of one year after issuance of the advance permission in October 2005, and on that basis concluded that Bouchikhi ceased to have parole or any other lawful status either in October 2006 or in March 2007, when his application for adjustment of status was denied. The legal authority Bouchikhi relies on is therefore inapplicable to the facts as the IJ determined them, and his challenge does not present an issue of law. We therefore lack jurisdiction to consider the argument on this issue presented in Bouchikhi's opening brief.[6]

Bouchikhi's reply brief includes additional arguments regarding when his parole ended. These arguments concern the meaning of language in § 212.5(e)(1) and § 1182(d)(5)(a). Though they present questions of law, Bouchikhi waived these arguments by omitting them from his opening brief. *United States v. Ogle*, 415 F.3d 382, 383 (5th Cir. 2005). In any event, they lack merit. Bouchikhi points out that § 212.5(e)(1)(ii) requires that an alien whose parole terminates

---

[6] We note, however, that the administrative record includes an I-94 form indicating that Bouchikhi's parole was authorized for a fixed period ending on February 4, 2007.

at the expiration of its authorized period be "processed in accordance with paragraph (e)(2)." Paragraph (e)(2) requires that DHS either remove or re-parole an alien whose parole has terminated. That, Bouchikhi argues, means that (e)(1)(ii)'s automatic termination of parole does not occur until "expiration of the authorized term AND the mandatory . . . commencement of removal proceedings . . . ." Bouchikhi is correct that when a non-departed alien's parole automatically terminates, DHS is obliged to either re-parole him or commence removal proceedings. But the language in (e)(1)(ii) imposing that requirement does not affect when the parole terminates: "Parole shall be automatically terminated without written notice (i) upon the departure . . . or, (ii), if not departed, at the expiration of the time for which parole was authorized, *and in the latter case the alien shall be processed in accordance with paragraph (e)(2) of this section except that no written notice shall be required.*" 8 C.F.R. § 212.5(e)(1) (emphasis added). Bouchikhi's interpretation of 8 U.S.C. § 1182(d)(5)(a) relies on language requiring that a non-departed alien whose parole has terminated must "'return or be returned'" to DHS custody. Therefore, he argues, "there can only be two ways [parole] may be terminated–by the alien's departure or by his return [to custody]. . . ." This argument fails for the same reason as Bouchikhi's interpretation of § 212.5(e)(1)(e)(1)(ii). Language requiring that a task be done *after* an alien's parole terminates does not thereby delay the event of termination until the task has been done.

Although Bouchikhi's asylum application was untimely, there is no filing deadline for an application for withholding of removal. *Arif v. Mukasey*, 509 F.3d 677 680 (5th Cir. 2007). We will therefore consider Bouchikhi's challenges to the exclusion of Gabbay's testimony and the sufficiency of the evidence regarding the IJ's denial of Bouchikhi's application for withholding of removal.

C. Bouchikhi's Expert Witness

The BIA has held that the sole test for admission of evidence at a deportation proceeding is whether it "is probative and its admission is fundamentally fair." *Matter of D-R-*, 25 I&N 445, 458, Int. Dec. 3708 (BIA 2011) (citation and internal quotation marks omitted). "The rules of evidence, including those that exclude hearsay, do not govern deportation proceedings." *Olabanji v. INS*, 973 F.2d 1232, 1234 (5th Cir. 1992). "But immigration judges must conduct deportation hearings in accord with due process standards of fundamental fairness." *Id.* We review a claim of a due process violation de novo. *Toscano-Gil v. Trominski*, 210 F.3d 470, 473 (5th Cir. 2000). To prevail, however, the alien must show substantial prejudice. *Id.* Under the circumstances of this case, that showing requires at least that the IJ's assessment of Gabbay's expertise was an abuse of discretion. That is the standard we apply when considering a district court's determination of the admissibility of expert evidence. *French v. Allstate Indem. Co.*, 637 F.3d 571, 577 (5th Cir. 2001). And the BIA accords similar discretion to immigration judges. *Matter of D-R-*, 25 I&N Dec. at 458.

While the Federal Rules of Evidence are not binding in removal proceedings, the BIA views them as providing "helpful guidance . . . because the fact that specific evidence would be admissible under the Federal Rules lends strong support to the conclusion that the admission of the evidence comports with due process." *Id.* at 458 n.9 (internal quotation marks and citation omitted). "An expert witness is broadly defined as someone who is 'qualified as an expert by knowledge, skill, experience, training, or education.'" *Id.* at 459 (quoting FED. R. EVID. 702). "An expert has 'scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting FED. R. EVID. 702).

No. 10-60982

The IJ's handling of Gabbay's testimony was not optimal.   After Gabbay indicated that he is not a specialist on Algeria, the IJ peremptorily refused to consider the possibility that he might have any applicable expertise.  Bouchikhi's counsel elicited testimony from Gabbay about his research on religious extremism in Muslim societies.  But the IJ categorically rejected the possibility that any expertise other than specialization in Algeria could qualify a witness to offer an opinion about what might happen to Bouchikhi when he returned. The better practice would be to allow the expert to explain the scope and basis of his particular expertise, and then to hear counsel out regarding how that expertise will bear on the material issues.

In this case we do not find that Bouchikhi was prejudiced.   Bouchikhi argues that Gabbay could have offered an opinion "as an expert on religious and social extremism in the Muslim world."  The record indicates otherwise.  Asked to summarize his qualifications, Gabbay said:

> I teach a focus on the Middle East and the Muslim world.  I am educated from Columbia University, I received a PhD. [sic], and I went and did a doctorate at the University of Chicago, all focusing on the sociology of the Muslim World [sic]. I teach classes, which of course Algeria and the challenges and also the opportunities there.  [sic] They are of importance and [an] integral part of the class.  My research deals with the Middle East and of course, in particular, after September 11, the issue of terrorism is important and Algeria is one of the important cases there.  I have my publications, I presented numerous papers and manuscripts, et cetera, where Algeria is an important part of it and what has happened in Algeria.  I am qualified as an expert on Algeria in more than ten cases, I believe, by Immigration Court.  I regularly inform the public media regarding questions that may come up about terrorism, and of course, Algeria is an important [part] of it.

Gabbay's C.V. indicates that in the last ten years he has taken a sustained professional interest in religious extremism, and a good deal of his recent unpublished work concerns the treatment of religious minorities and dissident Muslims in the Middle East.  Also, his present teaching load includes courses on

11

politics and conflict in that region, as well as a course on "the networking of terrorism." But his dissertation and peer-reviewed publications were on different sociological topics. They appear to have been largely devoted to a concept termed "social capital" and its relation to business enterprises and conflict resolution, with case studies drawn from the Middle East, particularly Israel and that country's foreign relations. He has written various chapter- and book-length manuscripts on religious extremism and closely related matters, but they were not published at the time of the hearing. It may well be that Gabbay's more recent work will yield publications qualifying him as an expert on religious extremism in the Middle East or Muslim societies generally, but it was not an abuse of discretion for the IJ to conclude that his attainments as of April 2009 did not qualify him to provide an expert opinion useful in assessing Bouchikhi's risk of persecution.

D. Sufficiency of the Evidence

We apply a highly deferential standard when reviewing an IJ's factual conclusion that an applicant is not eligible for withholding of removal. *Chen v. Gonzales*, 470 F.3d 1131, 1134 (5th Cir. 2006). The IJ's findings of fact are conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ." 8 U.S.C. § 1252(b)(4)(B); *Chen*, 470 F.3d at 1134. "To be eligible for withholding of removal, an applicant must demonstrate a clear probability of persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion." *Chen*, 470 F.3d at 1138 (internal quotation marks and citations omitted). Bouchikhi admitted he had never been harmed, arrested, or directly threatened while in Algeria. His parents and siblings have lived there for decades without incident, and there is scant evidence that Bouchikhi is even known to the entities he claims will harm him. His assertion that he will be harmed for his political and religious beliefs is based on speculation that he will attain prominence as a religious leader and

No. 10-60982

critic of the present regime, and thereby provoke a violent response from Algeria's government or extremist opposition groups. The evidence presented to the IJ does not compel the conclusion that Bouchikhi was eligible for withholding of removal.

## IV. Conclusion

Bouchikhi's petition is DISMISSED insofar as he challenges the IJ's finding of fact relating to when Bouchikhi's parole ended and the reasonableness of the delay between that event and his asylum application. In all other respects, the petition is DENIED.